Robert WATSON

v.

Gordon FOX et al.[1]

No. 2009–215–Appeal.

Supreme Court of Rhode Island.

May 22, 2012.

1. Since the plaintiffs initiated this action, the original defendant-parties, William Murphy and Joseph Montalbano, are no longer in public office. Pursuant to Rule 25(d) of the Superior Court Rules of Civil Procedure, their successors have automatically been substituted as parties.

Nicholas Gorham, Esq., North Scituate, for Plaintiff.

Max Wistow, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The plaintiff, Robert Watson, together with nine Republican colleagues from the Rhode Island House of Representatives, filed a complaint for declaratory relief in which they sought a ruling that the process the General Assembly used to allocate $2.3 million in state money for legislative grants to local and private organizations in the FY2008[2] budget act violated articles 5, 6, and 9 of the Rhode Island Constitution.[3] The plaintiffs brought this action in their individual capacities as Rhode Island taxpayers, and not in their capacities as elected officials. In response, the defendants filed a motion to dismiss the complaint under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. After considering both the written and oral arguments of the parties, a justice of the Superior Court granted the defendants' motion to dismiss. In doing so, she found that the plaintiffs lacked standing to bring their claim because Rhode Island does not recognize so-called "taxpayer standing," and because the plaintiffs were unable to articulate a particularized injury that was distinct from any suffered by the general public. Only the plaintiff Robert Watson perfected an appeal from that judgment to this Court. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The plaintiff's complaint challenges the constitutionality of a decades-old discretionary assistance program operated by the Rhode Island General Assembly, commonly known as the "legislative grant program." The program is administered under the auspices of the General Assembly's Joint Committee on Legislative Services (JCLS), which consists of "the president and the minority leader of the senate, the majority and minority leaders from the house of representatives, and the speaker of the house of representatives." G.L.1956 § 22–11–1. The JCLS is responsible for "all administrative matters affecting the operation of the general assembly, including, but not limited to * * * [t]he control of house and senate appropriations, including expenditures of standing, select, and special committees of the general assembly, except those provided otherwise by law * * *." Section 22–11–3(a)(3). On March 31, 2005, at an open meeting at which all the members of the committee were present, the JCLS adopted the current process by which organizations may apply for grants of state funds.[4]

---

**2.** The term "FY2008" refers to the 2008 fiscal year, which began on July 1, 2007, and ended on June 30, 2008.

**3.** The thrust of plaintiffs' complaint was that the General Assembly had violated the "separation of powers" principles embedded in the Rhode Island Constitution. *See* art. 5 ("The powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial."); art. 9 sec. 1 ("The chief executive power of this state shall be vested in a governor * * *."); art. 9 sec. 2 ("The governor shall take care that the laws be faithfully executed."). Additionally, plaintiffs alleged a violation of article

6, section 11, which states that "[t]he assent of two-thirds of the members elected to each house of the general assembly shall be required to every bill appropriating the public money or property for local or private purposes."

**4.** The vote was four members to one in favor of the process; plaintiff was the only member who voted in opposition. The minutes of the meeting reveal that the members openly acknowledged during the debate that for the grant appropriations to be approved as budgetary expenditures, "two-thirds of the members of both houses [would] have to pass and approve the budget."

The process begins when the legislative sponsor of a nonprofit entity or community organization files a preliminary grant application with the fiscal office of either the Rhode Island House or the State Senate. The record does not illuminate the decision-making process in great detail; however, it appears from the minutes of the 2005 meeting that the final decision about whether or not to award a grant to an applicant rests with the speaker of the House and the president of the Senate, depending upon the membership of the sponsoring legislator. If an applicant receives a grant, the JCLS posts the following identifying information on the General Assembly's website: (1) the name and address of the organization; (2) a contact person; (3) the amount requested; (4) the proposed purpose of the grant; and (5) the name of the grant's legislative sponsors. As a condition of receiving state funds, the organization is responsible for submitting a "legislative grant expenditure report" detailing all the expenditures associated with the award.[5] According to then-House Majority Leader, and now Speaker, Gordon Fox, the application process was modified to foster "disclosure and accountability."[6]

In late 2006, as part of the FY2008 budget process, the JCLS proposed an appropriation of $2.3 million in "other grants" as part of its legislative budget. This appropriation was included in the state budget that then-Governor Carcieri subsequently submitted to the legislature—a multivolume document that was hundreds of pages long—as a line item titled "Assistance, Grants, and Benefits." The plaintiff, along with Representatives McManus, Story, Ehrhardt, and Gorham, all of whom were plaintiffs below, introduced the original FY2008 budget bill in a condensed format.[7] That bill identified appropriations for the executive branch, the legislature, and the judiciary, but did not include line-item details for every appropriation in each branch. The bill was referred to the House Finance Committee, which held numerous public hearings, as it does annually. Eventually, the committee recommended an amended budget bill to the full House of Representatives.[8] Before the House voted on the finalized budget act, the House Fiscal Advisory Staff published a detailed budget analysis that identified the $2.3 million grant appropriation as a separate line item. However, the budget act itself did not include a line item for every appropriation, including the grant money.

Both chambers of the General Assembly passed the act and transmitted the budget to the Governor, who exercised his constitutional prerogative to veto it.[9] On June 21, 2007, the General Assembly voted to override the Governor's veto by a vote of more than the constitutionally-mandated three-fifths of the members of each cham-

5. Also, the state's auditor general is directed to randomly audit a minimum often legislative grant awards annually.

6. Speaker Fox outlined the purpose of the application process in his comments during the March 2005 open meeting of the JCLS.

7. It is the custom and tradition of the House that when the governor is a member of the Republican party, as was the case here, that the budget will be introduced by Republican members of the House.

8. While the bill was with the Finance Committee, Representative Gorham made a legislative attempt to require that a detailed itemization of each grant be included in the annual state budget. The line item would have contained essentially the same information as the General Assembly's website. The committee did not adopt the amendment.

9. The House passed the act by a vote of fifty-seven to sixteen; the Senate passed the act by a vote of twenty-nine to nine.

ber.[10] In both the initial vote to enact the budget and the vote to override the Governor's veto, the budget act passed by more than a two-thirds majority of both the House and the Senate, as required by article 6, section 11 of the Rhode Island Constitution. Nearly a year later, on June 17, 2008, plaintiff and his fellow House Republicans filed their complaint for declaratory relief; soon after, they filed a motion for summary judgment.

According to plaintiff, the process of allocating grants to nonprofit entities, however well-intentioned, committed a multitude of constitutional sins. Before a motion justice in Providence County Superior Court, plaintiff argued that the legislative grant program, as administered by the speaker of the House and the president of the Senate, unconstitutionally usurped the role of the executive branch because no member of the executive branch had any involvement or decision-making authority with respect to the recipients of the legislative grants. Additionally, he argued that the grants were unconstitutional appropriations because the failure to include the grants as a line-item appropriation deprived legislators of information to such a degree that the members could not have understood that they were voting to allot $2.3 million of public funds for local and/or private purposes. Therefore, plaintiff argues that a two-thirds majority of each chamber of the General Assembly effectively did not approve each appropriation.

In response to plaintiffs' complaint for declaratory relief, defendants filed a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, as well as an objection to plaintiffs' motion for summary judgment. The defendants argued that plaintiffs, as private taxpayers, lacked standing to bring the litigation because they could not demonstrate an injury-in-fact that was distinguishable from that suffered by the population at large. Furthermore, defendants argued that the request for declaratory relief would require the court to rule on a nonjusticiable political question.

A hearing was held before a justice of the Superior Court on October 28, 2008. After considering the written and oral arguments of the parties, the motion justice granted defendants' motion to dismiss. In a written decision, the motion justice ruled that it was "undisputed that plaintiffs suffered no injury beyond that suffered by the general populace and that they, therefore, cannot meet the injury-in-fact test." Furthermore, relying on this Court's ruling in *Sennott v. Hawksley*, 103 R.I. 730, 731–32, 241 A.2d 286, 287 (1968), she found that there was no time-sensitive element that would compel the court to "leap-frog" over the issue of standing. In addition, she ruled that even if plaintiffs could have demonstrated proper standing, the dispute invited "a political solution to an in-house legislative branch quarrel" and as such was a nonjusticiable political question. Accordingly, the motion justice granted defendants' motion to dismiss.[11]

## II

### Standard of Review

A trial justice considering a Rule 12(b)(6) motion "must look no further than the complaint, assume that all allegations in the complaint are true, and resolve any doubts in a plaintiff's favor." *McKenna v.*

---

10. The House voted to override the veto by a vote of fifty-eight to twelve; the Senate vote was twenty-nine to seven.

11. Because the motion justice granted defendants' motion to dismiss, she did not reach plaintiff's motion for summary judgment.

*Williams,* 874 A.2d 217, 225 (R.I.2005) (quoting *Rhode Island Affiliate, ACLU, Inc. v. Bernasconi,* 557 A.2d 1232, 1232 (R.I.1989)). "If it appears beyond a reasonable doubt that [the] plaintiff would not be entitled to relief, under any facts that could be established, the motion to dismiss should be granted." *Id.* (citing *Laurence v. Sollitto,* 788 A.2d 455, 456 (R.I.2002)). When this Court reviews a ruling that grants or denies a Rule 12(b)(6) motion, it applies the same standards as the trial justice. *See id.* (citing *Estate of Sherman v. Almeida,* 747 A.2d 470, 473 (R.I.2000)). "Consequently, it is our function to examine the complaint to determine if plaintiffs are entitled to relief under any conceivable set of facts." *Id.* (citing *Almeida,* 747 A.2d at 473).

## III

### Analysis

**A. Does plaintiff have standing under this Court's existing precedent?**

■ In this particular case, our analysis requires us to resolve a fundamental preliminary question: Is this Court presented with a justiciable controversy?[12] In short, "[t]he plaintiffs must have standing to bring this action, and the Superior Court must have subject matter jurisdiction over the issues raised in the complaint." *McKenna,* 874 A.2d at 225. "Standing is an aspect of justiciability and, as such, the problem of standing is surrounded by the same complexities and vagaries that inhere in justiciability." *Flast v. Cohen,* 392 U.S. 83, 98, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). As Chief Justice Warren aptly noted in *Flast,* standing is one of "the most

amorphous [concepts] in the entire domain of public law." *Id.* at 99, 88 S.Ct. 1942. In a frequently cited passage, the United States Supreme Court explained that to satisfy the standing requirement a complaining party must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Flast,* 392 U.S. at 99, 88 S.Ct. 1942. In other words, as this Court said in *McKenna,* "when standing is at issue, the focal point shifts to the claimant, not the claim, and a court must determine if the plaintiff 'whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable' or, indeed, whether or not it should be litigated." *McKenna,* 874 A.2d at 226 (quoting *Flast,* 392 U.S. at 99–100, 88 S.Ct. 1942).

■ In *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 22, 317 A.2d 124, 128 (1974), this Court articulated the applicable test. To satisfy the standing requirement, a plaintiff must allege "that the challenged action has caused him injury in fact, economic or otherwise." *Id.* (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Our prior cases have provided some depth to this seemingly sparse prescription, recognizing that plaintiff's alleged injury must be a "legally cognizable and protected interest that is 'concrete and

---

12. "Justiciability" is defined as "the quality or state of being appropriate or suitable for adjudication by a court." Black's Law Dictionary 943 (9th ed.2009). "The central concepts are elaborated into more specific categories of justiciability—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." 13 Charles A. Wright et al., *Federal Practice and Procedure* § 3529 at 278–79 (2d ed.1984).

particularized * * * and * * * actual or imminent, not 'conjectural' or 'hypothetical.' " *McKenna,* 874 A.2d at 226 (quoting *Pontbriand v. Sundlun,* 699 A.2d 856, 862 (R.I.1997)). In conducting our analysis in this case, we do not write on a blank slate; the necessity of a "concrete" injury has been the subject of particular emphasis in this jurisdiction. "[M]ere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' * * *." *Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 452 A.2d 931, 933 (R.I.1982) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). This Court has held fast to the notion that a plaintiff's injury must be "particularized" and that he must "demonstrate that he has a stake in the outcome that distinguishes his claims from the claims of the public at large." *Bowen v. Mollis,* 945 A.2d 314, 317 (R.I.2008); *see also Blackstone Valley Chamber of Commerce,* 452 A.2d at 933; *accord Frothingham v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In this jurisdiction, generalized claims alleging purely public harm are an insufficient basis for sustaining a private lawsuit. *See In re Review of Proposed Town of New Shoreham Project,* 19 A.3d 1226, 1227–29 (R.I. 2011) (mem.); *Berberian v. Solomon,* 122 R.I. 259, 261, 405 A.2d 1178, 1180 (1979); *McCarthy v. McAloon,* 79 R.I. 55, 62, 83 A.2d 75, 78 (1951).

■ Although this Court, unlike its federal counterparts, may entertain a request for an advisory opinion, the constitutional requirements for requesting such an opinion are strictly channeled. "This [C]ourt will not render an advisory opinion except upon the written request of the Governor *or* (not and) of either House of the General Assembly." *In re Advisory Opinion (Chief Justice),* 507 A.2d 1316, 1318 (R.I.1986) (citing *Industrial National Bank of Rhode Island v. Isele,* 101 R.I. 734, 737, 227 A.2d 203, 206 (1967)). "We are constitutionally obligated to give advisory opinions to either House of the General Assembly only when the questions propounded concern the constitutionality of pending legislation, and to the Governor only when the questions propounded concern the constitutionality of existing statutes which require implementation by the Chief Executive." *Id.* at 1318–19. Thus, this Court has held "that the Declaratory Judgments Act was 'not intended to serve as a forum for the determination of abstract questions or the rendering of advisory opinions.' " *McKenna,* 874 A.2d at 227 (quoting *Lamb v. Perry,* 101 R.I. 538, 542, 225 A.2d 521, 523 (1967)).[13]

■ We have little trouble concluding, and plaintiff nearly concedes, that if this Court's longstanding principles of standing are applied to the circumstances of this case, then his suit must fail. The plaintiff sought a declaratory judgment as a private taxpayer, eschewing his official position as House minority leader, and he asked the

---

**13.** In certain circumstances, this Court also may provide answers to questions of law propounded by the federal courts. Article I, Rule 6(a) of the Supreme Court Rules of Appellate Procedure provides:

"This Court may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or of the District of Colum-

bia, or a United States District Court when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this Court."

Superior Court to rule whether the General Assembly had expended public money in a manner that conflicts with the requirements of the Rhode Island Constitution. In our opinion, plaintiff has complained of no concrete, particularized harm; to the degree he can point to any injury, it is the same, indistinguishable, generalized wrong allegedly suffered by the public at large. *See Frothingham,* 262 U.S. at 487, 43 S.Ct. 597 (describing the plaintiff's claim to Treasury funds as an interest "shared with millions of others" that is "minute and indeterminable"). Moreover, plaintiff has taken pains to assure this Court that he seeks only prospective, declaratory relief—or as the motion justice cogently described it, "a shot across the bow"—to discourage the General Assembly from appropriating grants according to its past practices during future budget battles. Plainly, plaintiff is attempting to use the Uniform Declaratory Judgments Act (G.L. 1956 chapter 30 of title 9) to secure an advisory opinion that relates to hypothetical future conduct of the General Assembly. *See McKenna,* 874 A.2d at 226. We are resolute that this Court lacks the constitutional authority to provide such a ruling. *See In re Advisory Opinion (Chief Justice),* 507 A.2d at 1318–19. Indeed, plaintiff has been unable to evince any particularized injury that would remove this case from the realm of pure abstraction, and thus the relief that he seeks is really an advisory opinion cloaked in the garb of a request for declaratory relief.

The plaintiff urges that we view this case in light of the United States Supreme Court's holding in *Flast.* However, we agree with the majority of courts that the exception carved out in that case is exceedingly narrow in scope.[14] In *Flast* the Court held that certain plaintiff taxpayers had a sufficiently strong interest in ensuring that Congress did not expend public funds in a manner that contravened the Establishment Clause of the First Amendment to the United States Constitution that the "case or controversy" requirement was satisfied. *See Flast,* 392 U.S. at 105–06, 88 S.Ct. 1942. The Court held that to have standing, the taxpayer must challenge a specific congressional act made pursuant to the taxing and spending clause of Article I, section 8 of the United States Constitution and demonstrate a nexus between that expenditure and a specific, constitutional limitation applicable to Congress. *See Flast* at 102–03, 88 S.Ct. 1942. The United States Supreme Court has cabined this exception to Establishment Clause challenges, and it does not appear poised to expand its scope. *See Arizona Christian School Tuition Organization v. Winn,* — U.S. ——, 131 S.Ct. 1436, 1447, 179 L.Ed.2d 523 (2011) (holding taxpayer had no standing to challenge a tax credit, as opposed to a government expenditure, provided to a religious institution); *Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587, 593, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (holding taxpayer had no standing to attack discretionary spending of the Executive Branch that he alleged violated the Establishment Clause).

Perhaps having read the proverbial tea leaves, plaintiff zealously urges us at length to abandon our long-standing jurisprudence and join a number of other states that do recognize so-called "taxpayer standing." *See, e.g., Fergus v. Russel,* 270 Ill. 304, 110 N.E. 130 (1915); *Myers v.*

---

14. *See, e.g., Smith v. Jefferson County Board of School Commissioners,* 641 F.3d 197, 210 n. 5 (6th Cir.2011); *Newdow v. Rio Linda Union School District,* 597 F.3d 1007, 1017 (9th Cir. 2010); *Tarsney v. O'Keefe,* 225 F.3d 929, 937– 38 (8th Cir.2000); *Rocks v. City of Philadelphia,* 868 F.2d 644, 649 (3d Cir.1989); *Minnesota Federation of Teachers v. Randall,* 891 F.2d 1354, 1358 (8th Cir.1989); *Taub v. Kentucky,* 842 F.2d 912, 916 (6th Cir.1988).

*Nebraska Investment Council,* 272 Neb. 669, 724 N.W.2d 776 (2006); *Vette v. Childers,* 102 Okla. 140, 228 P. 145 (1924). After reviewing this Court's precedent and considering the decisions of other jurisdictions, we are not persuaded that such a radical departure is appropriate. First, all the cases cited by plaintiff to support this argument are factually inapt. In all those matters, the complaining party sought either injunctive relief to prevent public money from being expended or the disgorgement of money that had been dispersed in an unconstitutional manner. *See, e.g., Fergus,* 110 N.E. at 133 (action seeking injunctive relief); *Myers,* 724 N.W.2d at 786 (action seeking disgorgement and repayment of funds); *Vette,* 228 P. at 145 (action seeking injunctive relief). Here, plaintiff did not seek injunctive relief and he specifically has disavowed any intention of pursuing repayment of any of the money he contends the General Assembly granted in an unconstitutional way. Moreover, in our opinion, this Court's long-standing jurisprudence—perhaps to a greater degree than that of some other jurisdictions—has had a discernable focus on the requirement of concrete and particularized harm. *See Bowen,* 945 A.2d at 317; *McKenna,* 874 A.2d at 226–27; *Pontbriand,* 699 A.2d at 862; *Burns v. Sundlun,* 617 A.2d 114, 116 (R.I.1992). We will not depart from that precedent based on the facts before us here.

### B. The Substantial Public Interest Exception

■ Alternatively, plaintiff has suggested that we overlook the standing requirement by invoking this Court's so-called "substantial public interest" exception. It is true that "[o]n rare occasions this [C]ourt has overlooked the standing re-

quirement to determine the merits of a case of substantial public interest." *Burns,* 617 A.2d at 116. After a review of our case law, in our opinion, whether to apply the substantial public interest exception lies within the discretion of this Court, and we respectfully decline to exercise it in this case.

We observe that plaintiff waited until thirteen days before the expiration of the 2008 budget year to bring this action. Further, it gives this Court pause, as it did the motion justice, that plaintiff has taken no steps to join all the interested parties in this action. Although his complaint names the Speaker of the House and the President of the Senate as defendants, none of the organizations that received money via a process plaintiff alleges is unconstitutional are named as parties. The plaintiff argues that those organizations are not necessary parties because he does not seek reimbursement to the state. However, if a court were to reach the merits of this case, and if plaintiff prevailed, the rights of these absent parties unquestionably would be affected.

In our opinion, the fact that the plaintiff essentially is seeking an advisory opinion disguised as a request for a declaratory judgment leads us to refrain from exercising our discretion by overlooking the issue of standing.[15] This Court will not be persuaded to vault over the required showing of a particularized injury, economic or otherwise, when faced with questions of constitutional import that bear on the authority and duties of a coordinate branch of state government. In our opinion, to do so under these circumstances would be imprudent because this case lacks the "concrete adverseness" that assists us when we

---

15. Because we have resolved this matter on the issue of standing, we need not, and do not, reach the question of whether plaintiff's request involved a nonjusticiable political question.

are required to address thorny constitutional questions. *See Flast*, 392 U.S. at 99, 88 S.Ct. 1942; *Baker*, 369 U.S. at 204, 82 S.Ct. 691. Additionally, if we were to dispense with the requirement of standing here, in the words of Chief Justice Warren, it would tend to "distort the role of the Judiciary in its relationship to the Executive and the Legislature" and would verge on "government by injunction." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Accordingly, we agree with the motion justice's finding that the plaintiff failed to state a claim upon which relief could be granted, and therefore affirm her ruling granting the defendants' Rule 12(b)(6) motion to dismiss.

## IV

### Conclusion

The judgment of the Superior Court is affirmed. The papers in this case are remanded to the Superior Court.