June 17, 2022

**Supreme Court**

No. 2018-40-M.P.

In re Narragansett Electric Company   :
d/b/a National Grid E-183 115 kV
Transmission Line Relocation Project.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Narragansett Electric Company   :
d/b/a National Grid E-183 115 kV
Transmission Line Relocation Project.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** This Court issued a writ of certiorari to review an order of the Energy Facility Siting Board (the board or EFSB) concerning the relocation of power lines across the Providence and Seekonk Rivers. The petitioners, the City of Providence; Friends of India Point Park (FIPP); Procaccianti Companies, Inc. d/b/a The Hilton Garden Inn (Hilton); and McMac, Inc. d/b/a The R.I. Seafood Festival (Seafood Festival), seek review of the board's January 17, 2018 order determining that the so-called "underground alignment" and the "bridge alignment north" were not feasible, and approving the "bridge alignment south." The respondents, EFSB; the City of East Providence; and Narragansett Electric Company d/b/a National Grid (National Grid), allege that three of the petitioners do not have standing and that review of the board's decisions is not timely. For the reasons stated herein, we affirm the order of the EFSB.

# I

## Facts and Travel

In April 2003, National Grid filed a notice-of-intent application with the board requesting approval for the relocation of an approximately 6,200-foot portion of the power line designated as E-183 between Franklin Square in Providence and Bold Point in East Providence. In its application, National Grid explained that the project was required by the Rhode Island Department of Transportation to facilitate the relocation of I-195. National Grid asserted that the new alignment would not substantially differ from the alignment in use at the time, and it therefore proposed that the application was appropriate for abbreviated review under Rule 1.6(f) of the board's Rules of Practice and Procedure. *See* 445 RICR 00-00-1.6(f). Shortly after National Grid filed its notice-of-intent application, the City of Providence, the City of East Providence, and the Rhode Island Attorney General separately intervened in the matter pursuant to Rule 1.10(a)(1) of the board's Rules of Practice and Procedure. *See* 445 RICR 00-00-1.10(a)(1), (d)(2).

Rule 1.6(f) sets out the requirements for filing a notice of intent to, among other things, relocate an existing power line. 445 RICR 00-00-1.6(f). Once that notice of intent is filed, the board is required to hold a public hearing in one or more of the cities or towns affected by the application. *Id.* at 1.6(g). The board must then "determine whether the project may result in a significant impact on the environment

or the public health, safety and welfare[.]" *Id.* at 1.6(h). If the board so determines, the project is treated as an alteration and a full review is necessary; otherwise, the project receives abbreviated review. *Id.* From early June through early August 2003, the board held several public hearings to determine whether the proposed relocation would result in a significant impact, "thereby, requiring a full EFSB review."

In September 2003, National Grid and three intervenors, the Attorney General, Providence, and East Providence, entered into a stipulation and consent order regarding further proceedings (the stipulation). The parties agreed that the case could continue as an abbreviated, rather than a full, proceeding, but with certain modifications, such as requesting advisory opinions from several agencies and allowing National Grid and the intervenors to submit testimony. In October 2003, the board largely approved the stipulation, and issued an order incorporating most of the stipulation's terms, with several minor modifications (the 2003 order). Importantly, the 2003 order incorporated the parties' agreement that "the standard which the [b]oard shall apply in making its decision on Narragansett's application is that provided in R.I.G.L. § 42-98-11(b)." In relevant part, G.L. 1956 § 42-98-11(b) states that:

> "The board shall issue a decision granting a license only upon finding that the applicant has shown that:
>
> "(1) Construction of the proposed facility is necessary to meet the needs of the state and/or region for energy of the type to be produced by the proposed facility.

- 3 -

"(2) The proposed facility is cost-justified, and can be expected to produce energy at the lowest reasonable cost to the consumer consistent with the objective of ensuring that the construction and operation of the proposed facility will be accomplished in compliance with all of the requirements of the laws, rules, regulations, and ordinances * * * or that consideration of the public health, safety, welfare, security and need for the proposed facility justifies a waiver of some part of the requirements when compliance cannot be assured.

"(3) The proposed facility will not cause unacceptable harm to the environment and will enhance the socio-economic fabric of the state."

The 2003 order also required advisory opinions from the Department of Health, Department of Environmental Management, Statewide Planning Program, Public Utilities Commission (PUC), the Providence Planning Board, and the East Providence Planning Board.

In May 2004, National Grid, East Providence, Providence, and the Attorney General entered into a settlement agreement regarding the outcome of the relocation project (the settlement agreement). The agreement split the relocation project into two phases. Phase I, which involved overhead relocation of a portion of the E-183 power line through Providence, would be completed in 2005 to allow for the I-195 relocation project. Phase II consisted of the relocation of the remaining power line, beginning in Franklin Square in Providence and ending in East Providence.

The settlement agreement contemplated five alternative alignments for the Phase II power line relocation and ranked them by preference. The underground alignment, which would relocate the power line underground between Franklin Square and a new transition station in East Providence, was the preferred alignment; thus, it was to be constructed as long as it was not "too costly" or "not feasible (in light of such factors as engineering considerations, property rights or licensing issues)[.]"[1] If the underground alignment could not be constructed because it was too costly or was not feasible, the next preferred alignment was the bridge alignment north. If the bridge alignment north could not be constructed because it was deemed too costly or not feasible, the bridge alignment south was next preferred. If the bridge alignment south was too costly or not feasible, the final preferred alignment was the "Tockwotton alignment." If none of the preferred alignments could be constructed, National Grid was to complete the relocation according to its original plan, as explained in its notice-of-intent application, referred to in the settlement agreement as the "original alignment."

The settlement agreement also outlined how the determination would be made to move from one preferred alignment to the next preferred alignment. In the event

---

[1] Construction of the underground alignment also depended on obtaining any necessary permits or regulatory approval and on other conditions outlined in the settlement agreement, such as the transfer of easements to National Grid by the municipal parties. These conditions are not at issue in this case.

that National Grid found that an alignment was not feasible, it was to file either a stipulation, in which all parties consented to moving on to the next preferred alignment, or a report "presenting in detail the justifications for pursuing the alternative alignment[.]" If the latter option was used, the other parties could then file objections to the report, to which National Grid could respond. Subsequently, the board would conduct a hearing and "approve, modify or reject the [r]eport."

In the settlement agreement, Providence, East Providence, and the Attorney General principally agreed "not to appeal or otherwise contest a decision of the EFSB * * * which approves the project contemplated by this agreement." These parties also agreed not to contest before the EFSB, or any other governmental authority, a relocation made pursuant to the terms of the settlement agreement. However, an exception was carved out that allowed the parties to contest a decision by the board "rendered in proceedings pursuant to" determining the feasibility of an alignment, as discussed *supra*.

After conducting a hearing regarding the settlement agreement, the board issued a report and order on October 29, 2004, which approved and incorporated the settlement agreement (the 2004 order). In the 2004 order, the board considered whether the various alignments as stated in the settlement agreement met the standard for approval specified in § 42-98-11(b). The board referenced that the PUC found, in its advisory opinion, that there was a need to relocate the power line

between Franklin Square and East Providence, but the board did not itself make a specific finding that the project was necessary. The board went on to find that the relocation was cost-justified "whether it is constructed overhead * * * or underground[.]" The board also found that using any of the alignments as provided in the settlement agreement would "enhance the socio-economic fabric of the state and minimize the impact on the environment." In adopting the settlement agreement, the board also stated in the 2004 order that all "parties have agreed that the E-183 Line will be relocated underground unless it is determined that this is not feasible."

In October 2016, National Grid and East Providence filed a joint report and motion asking the board to approve the use of the bridge alignment south for the relocation project.[2] In this filing, National Grid and East Providence asserted that the underground alignment was not feasible "[b]ecause of the significant cost of the underground alignment and the risks which have been identified[.]" These parties also contended that the next preferred alignment, the bridge alignment north, was also not feasible because it would require either acquiring an active business or rerouting the river crossing.

---

[2] In the twelve years between the board's 2004 order approving the parties' settlement agreement and National Grid and East Providence's 2016 joint report and motion, a good many hearings and meetings took place, testimony from different parties was heard, estimates were obtained, and reports were filed. However, none of these actions are directly relevant to the matter before us.

The Attorney General did not oppose the joint report and motion and agreed that the bridge alignment south was the "most feasible[.]" However, Providence objected to the joint report and motion, asserting that it had "consistently taken the position * * * that the underground alignment can be achieved at a cost which is not unreasonable, given the aesthetic and ancillary benefits which would flow from the removal of the overhead transmission towers and wires."

The board conducted a hearing on National Grid and East Providence's joint report and motion in February 2017. National Grid then moved for an extension of time, which Providence supported and the board granted. Before the next hearing, Providence submitted a supplemental memorandum which advocated for "burial of such portions of the E-183 line as can reasonably be accomplished"; that is, for partial undergrounding. Providence stated its willingness to adopt the bridge alignment south if the portion of the power line through India Point Park was buried. At the next hearing on the joint report and motion, held on September 26, 2017, Providence conceded that the underground alignment as envisioned in the settlement agreement was not feasible; however, Providence continued to suggest a partially underground alignment. Ultimately, the board continued the hearing and asked the parties to brief whether Providence's partial-undergrounding proposal was within the settlement agreement. The board also asked Providence to brief the issue of the feasibility of its proposal. The matter was continued until October 18, 2017.

At the October 18, 2017 hearing, the board considered both a motion filed by Providence to extend time to determine the feasibility of its proposal and the joint report and motion of National Grid and East Providence to adopt the bridge alignment south. Ultimately, the board denied Providence's motion to extend time. The board also adopted National Grid and East Providence's report, accepting that the underground alignment and bridge alignment north were not feasible, and approved the bridge alignment south.

On January 17, 2018, the board issued a written order (the 2018 order) stating that the underground alignment and the bridge alignment north were not feasible and approving National Grid and East Providence's motion to use the bridge alignment south.

On January 29, 2018, Providence, FIPP, Hilton, and Seafood Festival jointly filed a petition for certiorari in accordance with § 42-98-12(b), which petition sought review of the 2018 order.[3] This Court issued the writ of certiorari on February 14, 2018.

---

[3] The Attorney General, despite being a party before the board, is not a party to this action. However, this Court allowed the Attorney General to participate in this action by filing an amicus curiae brief. We recognize that several individuals have served as Attorney General since National Grid filed its original application in 2003. Not surprisingly, the position taken by that office has not been consistent during the pendency of this case.

## II

## Standard of Review

Our review of decisions made by the EFSB is governed by § 42-98-12(b), which provides, in part, that EFSB decisions may be reviewed "in the manner and according to the standards and procedures provided in chapter 5 of title 39."

Accordingly, the EFSB's findings "on questions of fact shall be held to be prima facie true and as found by the [EFSB]" and this Court "shall not exercise its independent judgment nor weigh conflicting evidence." General Laws 1956 § 39-5-3. Thus, we will not "engage in factfinding or weigh conflicting evidence presented to the [EFSB]." *New England Telephone & Telegraph Company v. Public Utilities Commission*, 446 A.2d 1376, 1380 (R.I. 1982). We also will not "substitute our own judgment for that of the [EFSB.]" *United States v. Public Utilities Commission of State of Rhode Island*, 635 A.2d 1135, 1140 (R.I. 1993). Instead, our "inquiry is limited to the determination of whether the [EFSB]'s ruling is lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence." *New England Telephone & Telegraph Company*, 446 A.2d at 1380. This Court may reverse EFSB orders or judgments "made in the exercise of administrative discretion" if the EFSB "exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39-5-3.

Although we review the EFSB's factual findings deferentially, "pure questions of law, including statutory interpretations, * * * are reviewed *de novo* by this Court." *In re Proposed Town of New Shoreham Project*, 25 A.3d 482, 504 (R.I. 2011).

### III

### Discussion

Before this Court, petitioners first argue that the provision in the settlement agreement waiving any right to appeal or otherwise contest approval of the project is void as against public policy and, additionally, not binding upon "non-party [p]etitioners." The petitioners next contend that the board violated statutory procedures and "abdicated its statutory duty" by allowing the parties to determine the feasibility of alternative methods of relocating the lines. The petitioners also claim that the board's 2018 order contains no findings of fact as to the feasibility of either the underground alignment or the bridge alignment north. Finally, petitioners assert that the board "improperly authorized National Grid's use of ratepayer funds for purposes other than under-grounding in violation of state law and its own order."

The respondents East Providence and EFSB submit that petitioners FIPP, Hilton, and Seafood Festival lack standing to seek judicial review of the board's 2018 order and are not properly before the Court. The respondents additionally argue that review by way of certiorari is not timely; they submit that petitioners'

- 11 -

quarrel is with the 2004 order, not the 2018 order.  The petitioners contest both arguments.[4]

## A

## Standing

Both East Providence and the board contend that all petitioners except Providence lack standing to bring the instant action.  East Providence asserts that these petitioners do not have standing to object to a report filed under the settlement agreement because they were not parties to that agreement.  The board additionally avers that these petitioners do not cite particularized injuries that can form the basis for standing.  However, FIPP, Hilton, and Seafood Festival assert that they have standing and are properly before this Court.

As noted above, chapter 5 of title 39 of the general laws applies to our judicial review of decisions made by the board.  *See* § 42-98-12(b).  Accordingly, filing a petition for certiorari is the "exclusive remedy" for entities "aggrieved by any order or judgment of the [EFSB]." Section 39-5-1.  "It is well settled in this jurisdiction

---

[4] Before this Court, East Providence asserts that Providence agreed not to appeal or otherwise contest a decision of the board as part of the settlement agreement adopted by the board in its 2004 order.  However, although the parties to the settlement agreement generally agreed not to appeal or seek review, an exception was carved out for a decision rendered in accordance with Section II(J) of the agreement, which explained the procedure to be followed if any of the alignments were determined to be infeasible by National Grid.  The 2018 order resulted from hearings conducted in accordance with Section II(J) of the agreement, and, thus, Providence did not waive its right to seek review of that order.

that 'a person is so aggrieved by a judgment or order when such judgment or order results in injury in fact, economic or otherwise.'" *In re Review of Proposed Town of New Shoreham Project*, 19 A.3d 1226, 1227 (R.I. 2011) (mem.) (quoting *Newport Electric Corp. v. Public Utilities Commission*, 454 A.2d 1224, 1225 (R.I. 1983)). To form the basis for standing, the "alleged injury must be a 'legally cognizable and protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Watson v. Fox*, 44 A.3d 130, 135-36 (R.I. 2012) (alterations omitted) (quoting *McKenna v. Williams*, 874 A.2d 217, 226 (R.I. 2005)). Harms to aesthetic and recreational interests are cognizable interests. *See Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). However, "[m]ere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization * * * aggrieved." *Watson*, 44 A.3d at 136 (alterations omitted) (quoting *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 452 A.2d 931, 933 (R.I. 1982)).

Here, FIPP has not shown a sufficient particularized and concrete injury to establish its organizational standing on behalf of its members. FIPP points only to injuries that will affect the general public—the obstruction of water views on an entrance to Providence "used by some 60 million cars a year," the "conspicuous eyesore" of overhead power lines that would "mar[] water views" for many

- 13 -

"residents and visitors"—rather than to injuries specific to its members. *Cf. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181-83 (2000) (holding that affidavits from members of an organization, each alleging an inability to use outdoor areas for recreational activities, such as fishing and hiking, "adequately documented injury in fact"). FIPP appears to hold a longstanding interest in the resolution of this problem, but that interest is not sufficient to constitute an injury. *See Watson*, 44 A.3d at 136. And FIPP's contention that the board's decision "squandered" "a once-in[-]a[-]lifetime opportunity" to enhance the "economic and recreational value" of the area is not a concrete injury; rather, it is a concern that "implicate[s] questions of policy more appropriately addressed in the political arena." *In re Review of Proposed Town of New Shoreham Project*, 19 A.3d at 1229. Therefore, FIPP does not have standing.

Similarly, Seafood Festival does not have standing because it also does not claim a particularized, concrete injury that will result from the board's decision to approve the bridge alignment south. In its affidavit supporting the petition for certiorari, Seafood Festival asserted that, if the bridge alignment south were implemented, there would be a "specific and calculable economic loss to the many individuals and businesses who participate in events in the Park"; it did not describe its own potential losses or state that it would suffer particularized economic, aesthetic, or recreational harms.

- 14 -

We conclude, however, that Hilton has alleged particularized and concrete injuries so as to have standing in the instant matter. Hilton asserts that, if the bridge alignment south is implemented, "high-voltage power lines would virtually surround the Hotel" and would "obstruct views" both within the hotel and of the hotel from other locations, constituting a concrete and particularized aesthetic injury. Additionally, Hilton asserts that the existence of these lines around the hotel would "negatively impact" income generated by the hotel, as well as the commercial value of the hotel's property, thus also establishing a reasonably likely economic injury.[5]

## B

### Timeliness

The respondents next contend that review is barred because it is untimely, asserting that petitioners are, in fact, challenging the 2004 order, not the 2018 order. The respondents submit that, because petitioners did not seek review of the approval and incorporation of the settlement agreement within ten days of the entry of the 2004 order, their challenge is out of time. In response, petitioners argue that review is timely because, they assert, "[t]he relevant appeal period commenced as of January 17, 2018 – the date of the EFSB order actually approving the overhead relocation of the lines[.]" The petitioners further assert that the 2004 order did not

---

[5] Although a cognizable injury may not be "purely conjectural or hypothetical," parties can establish standing with a showing of "reasonable likelihood" of future injury. *Narragansett Indian Tribe v. State*, 81 A.3d 1106, 1111 (R.I. 2014).

- 15 -

approve the overhead alignment and that any findings the board made in 2004 were rendered nugatory through the passage of time.

Pursuant to § 42-98-12(b), "[a]ny person aggrieved by a decision of the board may within ten (10) days from the date of ratification of the decision, obtain judicial review of the decision[.]" Furthermore, the 2018 order directs the parties to this statute, and indicates that they "may, within ten (10) days of the issuance of this order petition the Supreme Court for a writ of certiorari to review the legality and reasonableness of [the] order."

The respondents filed their petition for writ of certiorari on January 29, 2018. The petition, as it relates to the January 17, 2018 order, was therefore timely.[6] Accordingly, our review requires an examination of each of the arguments raised by petitioners and the extent to which those arguments relate either to the 2004 order or the 2018 order.

In the 2004 order, the board rendered findings in accordance with the standard for granting a license found in § 42-98-11(b). The board referenced the PUC advisory opinion, which found that there was a need to relocate the transmission lines. The board then found that the facility was cost-justified, whether it was

---

[6] General Laws 1956 § 42-98-12(b) requires that a petition be filed within ten days of the EFSB's order. Here, the tenth day fell on Saturday, January 27, 2018, and the petition was filed on Monday, January 29, 2018. *See* Art. I, Rule 20(a) of the Supreme Court Rules.

- 16 -

constructed overhead or underground.  The board also discussed the socioeconomic aspects of relocating the lines and noted that several entities favored an underground alignment.  The board indicated that the parties agreed that the lines would be buried unless National Grid determined that it was not feasible, in which case "after an opportunity for objections from the other parties, the [b]oard will implement Section II-J of the [s]ettlement [a]greement."  In the 2018 order, the board indicated that the underground alignment and the bridge alignment north were not feasible and approved the use of the bridge alignment south.

The petitioners first argue that the provision in the settlement agreement waiving any right of review is void as against public policy and, additionally, not binding upon "non-party [p]etitioners."  This argument clearly relates to the 2004 order wherein the board *adopted and incorporated* the settlement agreement, and, thus, is not timely because the challenge was brought nearly fifteen years after the order had been issued. *See* § 42-98-12(b); *see also Interstate Navigation Co. v. Burke*, 465 A.2d 750, 754-55 (R.I. 1983) (concluding that the petitioner's failure to petition for a writ of certiorari within the statutory period required by § 39-5-1 rendered the order in that case "nonreviewable").

The petitioners next contend that the board violated statutory procedures and "abdicated its statutory duty" by allowing the parties to determine the feasibility of alternative methods of relocating the lines.  In support of this contention, petitioners

- 17 -

argue that the board improperly delegated its statutory authority, in violation of the nondelegation doctrine. The petitioners specifically take issue with the board's adoption and incorporation of the settlement agreement; they submit that the board "effectively delegat[ed its statutory duty] to a private utility company and other interested third parties" by allowing them to "evaluat[e] the feasibility of alternative [alignments] to the requested relocation of the power lines." This argument squarely falls within the ambit of the 2004 order. Accordingly, this argument also is not timely. *See* § 42-98-12(b).

Third, petitioners claim that the board's 2018 order contains no findings of fact as to the feasibility of either the underground alignment or the bridge alignment north. The petitioners submit that the board was required by both § 42-98-11(b)(3) and its own rules to make "specific findings" and provide a factual basis for its conclusions in the 2018 order. They also note that the board cannot rely on findings it made in the 2004 order, which, they submit, "have been rendered obsolete and inaccurate[.]" Accordingly, petitioners submit that, absent such findings of fact, the 2018 order cannot be upheld. This argument clearly is timely as it relates to the 2018 order; we therefore proceed to address it.[7]

---

[7] The petitioners additionally assert that the board "improperly authorized National Grid's use of ratepayer funds for purposes other than under-grounding in violation of state law and its own order." The petitioners acknowledge in their brief that they spent "[l]ittle time" on this argument. "This Court has consistently held that 'simply stating an issue for appellate review, without a meaningful discussion thereof or

- 18 -

## C

## Factual Findings

The petitioners submit that the 2018 order cannot be upheld because the board failed to make findings of fact in accordance with § 42-98-11(b) and EFSB Rule 1.13(c)(1).[8] Specifically, they allege that the board did not provide a "factual basis for its conclusion that burying all or some of the lines was not feasible[.]"

---

legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue.'" *Barnes v. Rhode Island Public Transit Authority*, 242 A.3d 32, 36-37 (R.I. 2020) (brackets omitted) (quoting *Fisher v. Applebaum*, 947 A.2d 248, 252 (R.I. 2008)).  Accordingly, we deem this issue waived.

[8] EFSB Rule 1.13(c)(1) provides that, in its final decision:

> "The Board shall make specific findings regarding and shall grant a Board License only upon a finding that the applicant has shown that:
> "i) Construction of the proposed facility is necessary to meet the needs of the state and/or region for energy of the type to be produced by the produced [*sic*] facility,
> "ii) The proposed facility is cost-justified,
> "iii) The proposed facility can be expected to produce energy at the lowest reasonable cost to the consumer consistent with the objective of ensuring that the construction and operation of the proposed facility will be accomplished in compliance with all of the requirements of the laws, rules, regulations, and ordinances, under which, absent the Act, a license would be required, or that consideration of the public health, safety, welfare, security and need for the proposed facility justifies a waiver or some part of such requirements when compliance therewith cannot be assured,

In response, East Providence and the board argue that the board's decision was "lawful and reasonable" and was supported by the fact that all parties before the board agreed that the underground alignment was not feasible. National Grid asserts that the board's determination that the underground alignment was not feasible "has ample evidentiary support in the record" and must be upheld. National Grid additionally submits that all parties agreed that the underground alignment was not feasible and that "[t]here was simply no dispute, factual or legal, for the EFSB to resolve since all issues, save for the feasibility of approved alternative alignments, had been resolved thirteen years prior." National Grid asserts that "[t]he purpose of requiring detailed findings in administrative decisions is to ensure that a 'judicial body might review a decision with a reasonable understanding of the manner in which evidentiary conflicts have been resolved.'" (Quoting *Thorpe v. Zoning Board of Review of Town of North Kingstown*, 492 A.2d 1236, 1237 (R.I. 1985).). Accordingly, it contends that a remand of the 2018 decision "serves no useful purpose other than to forestall the final determination of an issue not in dispute."

We begin by noting that the Court applies the same standards to orders and decisions of the EFSB as it does to those of the PUC, as set forth in chapter 5 of title

---

"iv) The proposed facility will not cause unacceptable harm to the environment, and
"v) The proposed facility will enhance the socioeconomic fabric of the state." 445 RICR 00-00-1.13(c)(1).

- 20 -

39 of the general laws. *See* § 42-98-12(b); *see also* § 39-5-3. Indeed, "this Court's deference to the PUC's factual findings is all but absolute." *In re A & R Marine Corp.*, 199 A.3d 533, 537 (R.I. 2019) (brackets omitted) (quoting *In re Proposed Town of New Shoreham Project*, 25 A.3d at 504). The Court "reviews judgments and orders of the PUC solely to determine whether the PUC's findings are lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific to enable us to ascertain if the evidence upon which the PUC based its findings reasonably supports the result." *Id.* (brackets omitted) (quoting *Narragansett Electric Co. v. Public Utilities Commission*, 773 A.2d 237, 240 (R.I. 2001)).

Furthermore, the EFSB's "proceedings shall in all respects comply with the requirements of the Administrative Procedures Act, [G.L. 1956] chapter 35 of [title 42]." Section 42-98-7(3)(e). Section 42-35-12 provides that "[a]ny final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

Although we agree with petitioners that the 2018 order failed to make findings of fact and conclusions of law in compliance with the Administrative Procedures Act, we conclude that remanding the case for such findings with regard to the underground alignment and the bridge alignment north is unnecessary.

Our review of the record indicates that all parties to the settlement agreement agreed that the underground alignment was not feasible. In their joint report and motion, National Grid and East Providence asserted that the underground alignment was not feasible "[b]ecause of the significant cost of the underground alignment and the risks which have been identified[.]" The Attorney General supported the joint report and motion.[9] Although Providence initially objected to the joint report and motion, it ultimately conceded at the September 26, 2017 hearing that the underground alignment as envisioned in the settlement agreement was not feasible. *See D & H Therapy Associates v. Murray*, 821 A.2d 691, 694 (R.I. 2003) ("Having eaten his cake, [the] defendant may not renounce its calories."); *see also Gaumond v. Trinity Repertory Company*, 909 A.2d 512, 519-20 (R.I. 2006) (applying the concept that "a defendant [in a criminal case] may not complain of testimony on appeal when such testimony was brought out by [the] defendant himself" to issues raised in the civil context (quoting *State v. Harris*, 871 A.2d 341, 345-46 (R.I. 2005))).

---

[9] In its response to the joint report and motion, the Attorney General concluded that "the Department believes the Bridge Alignment - South Alternative represents the most feasible, cost-effective solution that accomplishes the goals of the Settlement Agreement. Based on the foregoing, the Department does not oppose the Joint Report and Motion that National Grid and East Providence have filed with the EFSB."

At that hearing, EFSB Board Member Janet Coit sought to clarify the parties' positions:

> "[Board Member] Coit: * * * So first, could I just hear from all the parties clearly? East Providence and National Grid already moved jointly to determine that underground was not feasible. I take it from what you filed, City of Providence, and from comments on the record from the Attorney General's office at a previous meeting that all four parties to this agreement agree that the underground is not feasible. Could you all confirm that?
>
> "[Providence Assistant City Solicitor]: Yes.
>
> "[East Providence Assistant City Solicitor]: Yes.
>
> "* * *
>
> "[Assistant Attorney General]: I just want to make sure I understand the question.
>
> "[Board Member] Coit: The question is about the underground alignment as conceived of in the original settlement agreement * * *.
>
> "[Assistant Attorney General]: Yes, with the river crossings. Yes, that is correct. That is not feasible.
>
> "[Attorney for National Grid]: And I would answer the same way. * * *"

With regard to bridge alignment north, National Grid and East Providence submitted that it was not feasible because it would require either acquiring an active business or rerouting the river crossing. At oral argument before this Court, no party indicated its support for bridge alignment north. Indeed, in a submission to the

- 23 -

board, Providence stated its willingness to adopt the *bridge alignment south* if the portion of the power line through India Point Park was buried; it made no arguments in support of pursuing bridge alignment north. It therefore appears that no party is seeking to pursue implementing the bridge alignment north alternative.

Under the terms of the settlement agreement, which was incorporated in the 2004 order, if National Grid determined that the construction of a preferred alignment was not feasible, it was to present either a stipulation signed by all parties consenting to an alternative alignment or a report detailing the justifications for pursing the alternative alignment. If any party filed an objection to the report, the EFSB would then be required to "conduct a hearing to resolve such issues and/or disputes and approve, modify or reject the [r]eport."

Here, National Grid did file a joint report with East Providence, and Providence objected. The EFSB then conducted a hearing and ultimately approved the joint report in its 2018 order; that order, however, is devoid of any findings of fact or conclusions of law. Although the 2018 order makes note of the parties' agreement that the underground alignment was not feasible, its discussion as to the feasibility of both the bridge alignment north—the next preferred alignment under the settlement agreement—and the bridge alignment south was notably absent. The 2018 order provided no reasoning as to why the board "unanimously approved" the joint report and motion. The order merely restated the determinations of National

- 24 -

Grid and East Providence. As we have previously stated, "if it becomes impossible for us properly to fulfill our assigned function because of the PUC's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions, we will not speculate thereon nor search the record for supporting evidence or reasons." *Portsmouth Water and Fire District v. Rhode Island Public Utilities Commission*, 150 A.3d 596, 602 (R.I. 2016) (alterations omitted) (quoting *Narragansett Electric Company v. Rhode Island Public Utilities Commission*, 35 A.3d 925, 931 (R.I. 2012)).

Although remanding the case for such factual findings would ordinarily be appropriate, we conclude that in the circumstances of the case "[s]uch a remedy would be fruitless." *Bruce Pollak v. 217 Indian Avenue, LLC*, 222 A.3d 478, 484 (R.I. 2019); *see Guilford v. Mason*, 22 R.I. 422, 430, 48 A. 386, 388 (1901) (recognizing "[t]he maxim that the law does not compel one to do vain or useless things"); *cf. El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 498 (1st Cir. 1992) ("[E]quity will not require a useless thing[.]"). The parties agreed on the record that the underground alignment was not feasible, and no party has pursued the bridge alignment north. Remanding the case for findings of fact would clearly produce the same results and would only extend the proceedings regarding a project that was first proposed nearly twenty years ago. In accordance with the 2004 order and the

incorporated settlement agreement, the next preferred alignment is the bridge alignment south.  Accordingly, we uphold the 2018 order of the board.

## IV

## Conclusion

For the reasons stated herein, we affirm the 2018 order of the Energy Facility Siting Board.  The record may be returned to the Energy Facility Siting Board.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Narragansett Electric Company d/b/a National Grid E-183 115 kV Transmission Line Relocation Project. |
| **Case Number** | No. 2018-40-M.P. |
| **Date Opinion Filed** | June 17, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Energy Facility Siting Board |
| **Judicial Officer from Lower Court** | N/A |
| **Attorney(s) on Appeal** | For Petitioners:<br><br>Patrick C. Lynch, Esq.<br>Jeffrey B. Pine, Esq. |
| | For Respondents:<br><br>W. Mark Russo, Esq.<br>Steven J. Boyajian, Esq.<br>Marc DeSisto, Esq. |

SU-CMS-02A (revised June 2020)