July 14, 2023

**Supreme Court**

No. 2021-116-M.P.
(A.A. 20-72)
No. 2021-117-M.P.
(6CA 19-7653)

(Dissent begins on Page 31)

Apex Oil Company, Inc.,     :
individually and as Assignee of
Glencore, Ltd.

v.              :

State of Rhode Island, acting by and  :
through Division of Taxation.

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2021-116-M.P.
(A.A. 20-72)
No. 2021-117-M.P.
(6CA 19-7653)

(Dissent begins on Page 31)

Apex Oil Company, Inc.,                :
individually and as Assignee of
Glencore, Ltd.

v.                           :

State of Rhode Island, acting by and   :
through Division of Taxation.

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  These consolidated cases came before the Supreme Court on May 10, 2023, pursuant to a writ of certiorari upon petition of the plaintiff, Apex Oil Company, Inc. (Apex).  Apex seeks review of an order of the Sixth Division District Court dismissing two actions that challenge the State of Rhode Island Division of Taxation's denial of Apex's claim for a refund of $4,280,039.44 paid for Motor Fuel Tax assessed on the purchase and sale of 300,000 barrels of oil.  For the reasons set forth herein, we quash the order of the District Court.

- 1 -

## Facts and Travel

This tax appeal arises from a series of transactions for the purchase and sale of gasoline and concerns the application of the Motor Fuel Tax.[1] General Laws 1956 § 31-36-7(a) establishes a tax "on all taxable gallons of fuel sold or used in [the] state." Section 31-36-7(a) requires that:

> "Every distributor shall, on or before the twentieth (20th) day of each month, render a report to the tax administrator, * * * of the amount (number of gallons) of fuels purchased, sold, or used by the distributor within this state and the amount of fuels sold by the distributor without this state from fuels within this state during the preceding calendar month, and, if required by the tax administrator as to purchases, the name or names of the person or persons from whom purchased and the date and amount of each purchase, and as to sales, the name or names of the person or persons to whom sold and the amount of each sale * * *."

Section 31-36-2 requires that "[e]very distributor shall, before continuing or commencing to transact the business of a distributor, apply for registration as a distributor at the office of the tax administrator" and obtain "a certificate of the

---

[1] We pause to note that this is not the only case in which the Division's imposition of the Motor Fuel Tax has been challenged. *See Gunvor USA, LLC v. State of Rhode Island*, No. 2021-165-M.P. (a challenge to the imposition of the Motor Fuel Tax on a transaction between Glencore, Ltd. and PetroChina International (America), Inc., pending before this Court); *Gunvor USA, LLC v. State of Rhode Island*, No. 2021-260-M.P. (also challenging the imposition of the Motor Fuel Tax on a transaction between Glencore, Ltd. and PetroChina International (America), Inc.); *see also Gunvor USA, LLC v. State of Rhode Island*, CA 20-2187 (same).

registration" which "entitle[s] the distributor to continue or to commence to engage in the business within th[e] state."  A distributor is defined as:

> "[A]ny person, association of persons, firm, or corporation, wherever resident or located, who or that shall import, or cause to be imported into this state, for use or for sale, fuels, and also any person, association of persons, firm, or corporation who or that shall produce, refine, manufacture, or compound fuels within this state." Section 31-36-1(2).[2]

The tax at the center of this dispute was levied on a transaction between Apex and Glencore, Ltd. (Glencore) in which Apex purchased 300,000 barrels of gasoline from Glencore.  The gasoline at issue was the subject of numerous transactions

---

[2] General Laws 1956 § 31-36-16 also provides that:

> "Any person who shall receive fuels in any form and under any circumstances that shall preclude the collection of the tax provided for in this chapter, from the distributors, and shall then sell or use the fuels in any manner and under any circumstances that shall render the sale or use subject to the tax, shall be considered as a distributor, and shall make the same report, pay the same taxes, and be subject to all other provisions of this chapter relating to a distributor of the fuels; excepting, that the requirements under this chapter for the filing of a bond shall be discretionary with the tax administrator, and if the bond is required to be filed it shall be in an amount not to exceed seventy-five thousand dollars ($75,000)."

between various entities—a series of transactions often referred to as a "chain transaction."[3]

This chain transaction began on January 19, 2018, when Apex agreed to sell 300,000 barrels of gasoline to BP North America Petroleum, Inc. (BP). According to Apex, when it entered into this contract, it did not yet have the 300,000 barrels of gasoline it agreed to sell to BP. In order to fulfill its obligation to BP, on March 15, 2018, Apex purchased 300,000 barrels of gasoline from Glencore, which was transferred to BP.[4] BP in turn sold the gasoline to ExxonMobil. Thus, ownership of the gasoline passed from Glencore, to Apex, then to BP, and finally to ExxonMobil, the final link in the chain.

After the purchase between Apex and BP was already complete, the 300,000 barrels of gasoline were loaded onto a ship, the *Northern Ocean*, on May 1, 2018, in Antwerp, Belgium, and were transported across the Atlantic Ocean to a facility in East Providence, Rhode Island, at the direction of the owner at that time, ExxonMobil. The gasoline arrived and was discharged at a pier owned by

---

[3] A chain transaction is the "consecutive suppl[y] of goods between three or more legal entities, where the contractual obligations of all parties in the chain are discharged by a single movement of goods from the first supplier in the chain to the final customer." *ECJ AG Allows Belgian Coordination Centers Through 2010*, 17 J. Int'l Tax'n 5 (2006).

[4] The contract between Apex and BP provided that the 300,000 barrels of gasoline would be "delivered at place" on the Atlantic Coast of the United States between May 10, 2018, and May 20, 2018, on a BP approved vessel.

ExxonMobil in East Providence on May 21, 2018, and was thereafter distributed by ExxonMobil in the ordinary course of its business.

As part of its contract with Glencore, Apex agreed to pay any taxes assessed on the sale of the 300,000 barrels of gasoline. According to Apex, on May 14, 2018, during a phone conversation, the State of Rhode Island Division of Taxation (the Division) advised Apex that it "does not tax waterborne vessel chain transactions occurring before the gasoline arrives in Rhode Island." However, "[o]ut of an abundance of caution" and in an attempt to avoid incurring any taxes on the transaction, Apex applied for a motor fuel distributor registration certificate from the Division in May of 2018, prior to the imposition of any tax, because under § 31-36-13, "any distributor shall be exempt from the payment of any tax on fuels sold by the distributor to another distributor who is registered with the tax administrator." At the time of the sale between Glencore and Apex, Apex was not a registered distributor in Rhode Island. The Division denied Apex's application for a certificate of registration on June 21, 2018, because it was not a "distributor within Rhode Island." The Division explained that "[i]n order to be considered a distributor within Rhode Island, you must have storage facilities within our state" and, based on Apex's application, it did "not have storage facilities within Rhode Island" and therefore did "not qualify as a [d]istributor within Rhode Island."

Thus, according to Apex, based upon the Division's response, and its understanding of § 31-36-7, it was under the belief that Glencore would not be taxed for the sale of the gasoline to Apex because the gasoline was not imported, purchased, or sold within Rhode Island. Rather, Apex assumed that ExxonMobil—the importer and distributor of the gasoline in Rhode Island—would be the entity taxed for the gasoline.

To Apex's dismay, in October 2018, the Division imposed a Motor Fuel Tax on the sale of the 300,000 barrels of gasoline from Glencore to Apex by way of a letter to Glencore.[5] According to Apex, a tax exceeding $4 million was imposed because Apex was not a "licensed distributor" in Rhode Island. The tax was charged to Glencore as the seller of the gasoline. The Division also imposed interest and penalties on top of the tax as permitted by § 31-36-9. Glencore initially paid the tax in October of 2018 and thereafter challenged only the interest and penalties assessed on top of the tax, but did not challenge the amount of the tax itself; Glencore and the Division entered into a settlement agreement regarding the penalties and interest.

Glencore sought reimbursement from Apex in the amount of $4,280,039.44

---

[5] According to Apex, the Division "initially assessed the tax * * * in October 2018 by issuing a private letter ruling to Glencore based on limited information."

for the tax.[6] Apex reimbursed Glencore in accordance with their agreement, and as a result, Apex obtained "a full assignment of Glencore's rights to obtain a refund and challenge the Motor Fuel Tax * * *."

Believing the tax was improperly imposed on the transaction between Glencore and Apex, Apex sought a refund from the Division. First, on January 15, 2019, it requested a private-letter ruling[7] from the Division on its reasoning for imposing the tax; the Division failed to respond substantively to this request for six months and ultimately refused to issue a ruling. Subsequently, on May 31, 2019,

---

[6] Although not in the record before us, during oral argument, the parties represented to the Court that Glencore sued Apex for reimbursement of the tax pursuant to the terms of the contract in early 2019 in federal district court.

[7] According to the Division:

> "A General Informational Letter, (commonly referred to as a 'Letter Ruling') is unlike a Declaratory Order in that it generally seeks an interpretation of tax law or regulation without applying it to a specific set of facts. A General Informational Letter may be issued where it appears that general information only is requested, or where a request for a Declaratory Order does not comply with all the requirements for a Declaratory Order. General Informational Letters may not be relied upon by any taxpayer other than the taxpayer who requested the information. General Informational Letters are not binding on the Tax Division if there has been a misstatement or omission of material facts or, on a prospective basis, if there has been a change in law or applicable regulations or a decision on point is issued by the Rhode Island or Federal Courts." 280 RICR 20-00-5.3.

based upon its assignment of Glencore's rights, Apex submitted a claim for a refund of the Motor Fuel Tax pursuant to § 31-36-13 which provides, in part:

> "Any person who shall purchase fuels upon which the tax provided in this chapter shall have been paid and shall sell the fuels outside this state or to the United States government, may be reimbursed the amount of the tax in the manner and subject to the conditions provided in this chapter. All claims for reimbursement shall be made under oath to the tax administrator upon forms to be obtained from the tax administrator, within two hundred forty (240) days from the date of the purchase of the fuels, and shall contain any information and proof that the tax administrator may require, that the claimant has paid the tax and that the fuels have been sold by the claimant outside this state or to the United States government. Claims for reimbursement shall be paid by the general treasurer from the general fund upon certification by the tax administrator and with the approval of the controller."

Apex explained in its application that it sought a refund "because the * * * gasoline at issue was sold outside of Rhode Island." Section 31-36-9(7) also provides that "[a]ny person aggrieved by any assessment, deficiency, or otherwise, shall notify the tax administrator in writing within thirty (30) days from the date of mailing by the tax administrator of the notice of the assessment and shall request a hearing relative to it."

By way of a letter, dated June 6, 2019, the Division denied Apex's claim for a refund and asserted that Apex did not have a right to pursue a refund. As justification for its decision, the Division first asserted that Apex's request for a refund was time-barred; because, it asserted, the statute of limitations for requesting

a refund of the Motor Fuel Tax was 240 days from the date of the purchase of the fuel, pursuant to § 31-36-13, the purchase date was May 24, 2018, and the claim for a refund was submitted on May 31, 2019. As to the substance of Apex's claim that the tax was improperly imposed on the transaction between it and Glencore, the Division concluded that, "based on information given to the [Division] regarding [the] transaction[], the sale[] happened within Rhode Island[,]" making it subject to the Motor Fuel Tax. Lastly, the Division noted that Apex itself was not the entity that was charged the tax nor the entity that had paid the tax. As a result, the Division concluded that Apex was not entitled to a refund.

On June 25, 2019, prior to initiating an administrative appeal of the Division's denial of its claim for a refund, Apex filed a complaint in the Sixth Division District Court (the first action) alleging constitutional violations (count one), violations of the Motor Fuel Tax (count two), seeking a declaratory judgment that the tax applied only to entities that import gasoline into Rhode Island (count three), and asserting that the Division should be estopped from taxing the transaction based on the Division's representations to Apex (count four). The Division filed a motion to dismiss, asserting that Apex lacked standing and had failed to exhaust its administrative remedies. The Division also filed a motion to stay discovery and for a protective order pursuant to Rule 26(c) of the District Court Rules of Civil

Procedure. The trial judge denied the Division's motion to dismiss and stayed all proceedings in the case pending the outcome of Apex's administrative appeal.

On July 2, 2019, at the administrative level, Apex appealed the Division's decision denying its request for a refund of the tax and requested an administrative hearing. In its appeal letter, Apex claimed that it had obtained a contractual assignment of Glencore's rights and therefore had standing to seek a refund of the tax. Apex also asserted that the purchase and sale of the gasoline occurred outside of Rhode Island, as Apex is an entity based in Missouri and Glencore an entity based in New York, and furthermore, by the time the gasoline had reached Rhode Island, title had passed to ExxonMobil—the entity Apex asserted should be responsible for paying the Motor Fuel Tax and which had already paid the tax. Because the tax had already been charged to ExxonMobil, and "[t]o the best of Apex's understanding, ExxonMobil * * * ha[d] paid all applicable taxes" Apex argued that the imposition of the tax on the Apex-Glencore transaction resulted in an improper "double taxation" on the same gasoline. It also asserted that the Division's interpretation of the statute of limitations violated its due-process rights because the Division did not demand payment of the tax until October 2018, and further asserted that Apex had initially sought a refund on January 15, 2019, within the limitations period.

The Division moved to dismiss the appeal and argued that (1) Apex lacked standing, (2) the doctrines of *res judicata* and administrative finality precluded

Apex's claims, and (3) the statute of limitations barred Apex's appeal. A hearing was held and, on October 15, 2020, the hearing officer issued a written decision recommending that the Division's motion to dismiss be granted. The hearing officer first concluded that the 240-day statute of limitations within § 31-36-13 was not applicable to Apex's claim for a refund because Apex itself did not pay the tax to the Division and thus could not properly seek reimbursement under the statute. The hearing officer explained that, in order to properly challenge an assessment of the Motor Fuel Tax, a taxpayer may invoke § 31-36-9(7), of which, according to the hearing officer, Glencore, the entity that paid the tax, properly availed itself by challenging the interest and penalties imposed on top of the tax assessment.

As to the issue of standing, the hearing officer determined that Apex neither had statutory standing nor had it suffered an injury in fact. On the issue of statutory standing, the hearing officer explained that Apex did not pay the tax to the Division at the time of the purchase of the gasoline and therefore could not properly seek reimbursement under § 31-36-13. Because it could not seek reimbursement under § 31-36-13, it also could not appeal the tax assessment under § 31-36-9 because no tax assessment was issued to it. The hearing officer also concluded that Apex had not suffered an injury in fact because Glencore, not Apex, paid the tax and "[a]ny injury that [Apex] suffered was from its contractual arrangement with [Glencore]."

Lastly, the hearing officer determined that even though Apex had received an assignment of Glencore's rights, Glencore had settled its appeal of the tax assessment with the Division. Therefore, Glencore could not have challenged the validity of the tax itself due to the doctrines of *res judicata* and administrative finality. Thus, when Glencore assigned Apex its rights, those rights did not include the right to challenge the validity of the tax. Accordingly, the hearing officer concluded that Apex's claim was barred by both *res judicata* and administrative finality. After reviewing the hearing officer's decision and recommendation, the tax administrator adopted the decision.

On November 27, 2020, Apex filed an administrative appeal of the Tax Administrator's decision in the Sixth Division District Court. The Division filed a motion to dismiss in which it contended that Apex lacked standing to bring the action, the action was barred by the doctrines of *res judicata* and administrative finality, and Apex's request for a refund was untimely.[8]

On April 21, 2021, the trial judge consolidated both cases before the District Court and a hearing was held on the motion to dismiss. The trial judge granted the motion, concluding that because Apex's claims were barred by *res judicata*, the Tax

---

[8] The Division also filed a motion to lift the stay imposed in the first action, which the court granted.

Administrator's decision of dismissal was affirmed. As a result, both cases were dismissed. Apex then filed petitions for writs of certiorari, which this Court granted.

**Standard of Review**

"The General Assembly has directed that each appeal of a final decision of the tax administrator 'shall be an original, independent proceeding in the nature of a suit in equity to set aside such final decision and shall be tried de novo and without a jury' in the District Court." *Dart Industries, Inc. v. Clark*, 696 A.2d 306, 309 (R.I. 1997) (quoting G.L. 1956 § 8-8-24). "A party aggrieved by a final judgment of the District Court in a tax proceeding may petition this Court 'for a writ of certiorari to review any questions of law involved.'" *Id.* (quoting G.L. 1956 § 8-8-32). "Our review on a writ of certiorari is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling." *In re McBurney Law Services, Inc.*, 798 A.2d 877, 881 (R.I. 2002) (quoting *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 577 (R.I. 1997)). "In reviewing a District Court's decision on a tax matter, brought before us under § 8-8-32, we do not weigh the evidence in the record to resolve disputes of fact. * * * Rather, we address questions of law involving the applicability of a statute to undisputed facts." *Rollins Hudig Hall of Rhode Island, Inc. v. Clark*, 785 A.2d 523, 527 (R.I. 2001) (internal quotation marks omitted).

"The sole function of a motion to dismiss is to test the sufficiency of the complaint." *Benson v. McKee*, 273 A.3d 121, 127 (R.I. 2022) (quoting *Gannon v. City of Pawtucket*, 200 A.3d 1074, 1077 (R.I. 2019)). "In reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6), this Court applies the same standard as the hearing justice."[9] *Barrette v. Yakavonis*, 966 A.2d 1231, 1233 (R.I. 2009). "[A] motion to dismiss may be granted only if it appears beyond a reasonable doubt that a plaintiff would not be entitled to relief under any conceivable set of facts." *Willner v. South County Hospital*, 222 A.3d 1251, 1255 (R.I. 2020) (quoting *Dent v. PRRC, Inc.*, 184 A.3d 649, 653 (R.I. 2018)). "[A] determination of res judicata generally requires the court to look beyond the pleadings to the judgment and other pertinent portions of the record in the prior action * * *." *DiBattista v. State, Department of Children, Youth & Families*, 717 A.2d 640, 642 (R.I. 1998) (mem.). "Ordinarily, when ruling on a motion to dismiss * * * 'a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment.'" *Chase v. Nationwide Mutual Fire Insurance Company*, 160 A.3d 970, 973 (R.I. 2017) (quoting *Alternative Energy, Inc. v. St. Paul Fire & Marine Insurance Co.*, 267 F.3d 30, 33 (1st Cir.

---

[9] Rule 12(b)(6) of the District Court Civil Rules is identical to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. This Court will look to cases interpreting certain Superior Court rules for guidance in interpreting District Court rules. *See Verizon New England Inc. v. Savage*, 267 A.3d 647, 650-51 n.4 (R.I. 2022).

2001)). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* "In our review, '[w]e will assume[ ] the allegations contained in the complaint to be true and view * * * the facts in the light most favorable to the plaintiff[].'" *Warfel v. Town of New Shoreham*, 178 A.3d 988, 991 (R.I. 2018) (quoting *Audette v. Poulin*, 127 A.3d 908, 911 (R.I. 2015)).

Whether plaintiff has standing to bring an appeal is a mixed question of law and fact. *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I. 2000). "A trial justice's findings on mixed questions of law and fact are generally entitled to the same deference as the justice's findings of fact." *Id.* (quoting *Hawkins v. Town of Foster*, 708 A.2d 178, 182 (R.I. 1998)). "But, when those mixed questions of law and fact impact constitutional matters, we shall review the findings *de novo * * *.*" *Id.* Furthermore, "[t]he determination of whether [*res judicata*] should be applied presents a question of law * * * and therefore we shall review this issue *de novo*." *Casco Indemnity Company v. O'Connor*, 755 A.2d 779, 782 (R.I. 2000).

**Analysis**

On appeal, Apex claims that (1) it has standing because it suffered an injury in fact and is the beneficiary of express statutory authority granting standing to seek a refund of the Motor Fuel Tax; (2) the trial judge erred in concluding that *res*

- 15 -

*judicata* bars its appeal; and (3) the doctrine of administrative finality does not apply to bar its claims.[10] We address these claims in turn.

**Standing**

The Division asserts that Apex has neither standing arising from an injury in fact nor from statute.[11] According to the Division, Apex cannot have suffered an injury in fact because it was not "the entity that paid the subject tax." The Division argues that "it [was] not the assessment of the motor fuel tax, or the statute imposing such assessment, that caused Apex's alleged injury, but rather the terms of a contract between Apex and Glencore, who actually paid the motor fuel tax." As to statutory standing, the Division argues that Apex does not have standing pursuant to § 31-36-13 because Apex is not entitled to a refund as "it cannot provide proof that it paid the tax." In the Division's view, Glencore, as the taxpayer, has exclusive

---

[10] Apex also claims that (1) the Division's refusal to consider the merits of its appeal violate its due-process rights; (2) the Division exceeded its authority in imposing the Motor Fuel Tax on its transaction with Glencore which occurred outside of Rhode Island; and (3) the assessment of the tax on the Apex-Glencore transaction resulted in an improper "double taxation" on the same gasoline. Because Apex's appeal was dismissed on procedural grounds, we conclude that the merits of Apex's claims are reserved for the trial judge on remand. We therefore decline to address these claims.

[11] Although the trial judge did not address the issue of standing, the hearing officer determined that Apex had neither statutory standing, nor had it suffered an injury in fact. In light of this decision, and because the issue is likely to arise on remand, we address it. *See School Committee of City of Providence v. Board of Regents for Education*, 112 R.I. 288, 294, 308 A.2d 788, 791 (1973) (explaining that procedural questions "which, because they are likely to arise on remand, should now be decided").

standing under § 31-36-13 to request a refund.

Apex, on the other hand, contends that it has standing because it has suffered an injury in fact and because it is the beneficiary of express statutory authority granting standing set forth in § 31-36-13. Specifically, Apex argues that because it paid more than $4 million for the Motor Fuel Tax, it has suffered an injury that is concrete and particularized and, therefore, has standing to challenge the tax on its own account, separate and apart from the assignment from Glencore. Apex also asserts that § 31-36-13 confers standing. According to Apex, the statute "permits 'any person who shall purchase fuels upon which the tax is provided' to seek reimbursement" and Apex is such a person as it purchased 300,000 barrels of gasoline which was taxed. (Quoting § 31-36-13.) Lastly, Apex contends that it has standing pursuant to G.L. 1956 § 9-2-8, which confers standing based upon its assignment from Glencore. We conclude that Apex has suffered an injury in fact and therefore has standing to challenge the Division's imposition of the Motor Fuel Tax on its purchase of gasoline from Glencore.

Significantly, the record indicates that chain transactions generally are nontaxable events when the parties are entities that are registered with the Division. Apex contends that its application for a motor fuel distributor registration certificate was rejected by the Division based on its determination that Apex was not a "distributor within Rhode Island" and did "not have storage facilities within Rhode

- 17 -

Island" and therefore did "not qualify as a [d]istributor within Rhode Island." Apex challenges this denial. Certainly, if Apex had been a registered distributor, this case would not be before us. *See* § 31-36-13 ("[A]ny distributor shall be exempt from the payment of any tax on fuels sold by the distributor to another distributor who is registered with the tax administrator.").

"It is well settled that a necessary predicate to this Court's exercise of jurisdiction is an actual, justiciable controversy." *H.V. Collins Company v. Williams*, 990 A.2d 845, 847 (R.I. 2010). "For a claim to be justiciable, two elemental components must be present: (1) a plaintiff with the requisite standing and (2) some legal hypothesis which will entitle the plaintiff to real and articulable relief." *Id.* (quoting *N & M Properties, LLC v. Town of West Warwick*, 964 A.2d 1141, 1145 (R.I. 2009)). "To determine whether a plaintiff has standing to sue, the court must focus on the party who is advancing the claim rather than on the issue the party seeks to have adjudicated." *Dauray v. Mee*, 109 A.3d 832, 840 (R.I. 2015) (quoting *N & M Properties*, 964 A.2d at 1145). "This [C]ourt * * * requires a complaint to contain specific statements from which standing may be inferred." *Berberian v. Solomon*, 122 R.I. 259, 262, 405 A.2d 1178, 1180 (1979). "In the absence of any allegations concerning standing, we are not at liberty to presume standing." *Id.*

There are two types of standing, arising from either an injury in fact or a statute. *See Tanner v. Town Council of Town of East Greenwich*, 880 A.2d 784, 792

- 18 -

(R.I. 2005) ("A party acquires standing either by suffering an injury in fact or as the beneficiary of express statutory authority granting standing.").

We confine our focus to whether Apex has suffered an injury in fact. "The standing inquiry is satisfied when a plaintiff has suffered some injury in fact, economic or otherwise." *Dauray*, 109 A.3d at 840 (quoting *N & M Properties*, 964 A.2d at 1145). "Injury in fact has been described as an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not conjectural or hypothetical." *Haviland v. Simmons*, 45 A.3d 1246, 1256 (R.I. 2012) (quoting *Pontbriand v. Sundlun*, 699 A.2d 856, 862 (R.I. 1997)). "The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." *Pontbriand*, 699 A.2d at 862 (quoting *Matunuck Beach Hotel, Inc. v. Sheldon*, 121 R.I. 386, 396, 399 A.2d 489, 494 (1979)). Furthermore, "[t]he part[y] bringing the action 'must demonstrate that [it has] a stake in the outcome that distinguishes [its] claims from the claims of the public at large.'" *Benson*, 273 A.3d at 129 (quoting *In re 38 Studios Grand Jury*, 225 A.3d 224, 233 (R.I. 2020)). "[T]he essence of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to ensure concrete adverseness that sharpens the presentation of the issues upon which the court depends for an illumination of the questions presented." *Narragansett Indian Tribe v. State*, 81 A.3d 1106, 1110 (R.I. 2014) (quoting *Blackstone Valley Chamber of*

- 19 -

*Commerce v. Public Utilities Commission*, 452 A.2d 931, 933 (R.I. 1982)).

"Moreover, 'there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly * * * trace[able] to the challenged action of the defendant, and not * * * th[e] result [of] the independent action of some third party not before the court.'" *Mruk v. Mortgage Electronic Registration Systems, Inc.*, 82 A.3d 527, 535 (R.I. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Lastly, 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).

Viewing the allegations in its complaint in the light most favorable to Apex, we are of the opinion that Apex has met the standing requirement because it has suffered an injury in fact fairly traceable to the Division, the principal actor in this controversy. Apex claims that the Division improperly denied it a motor fuel distributor registration certificate, which, we again note, would have exempted the Glencore-Apex transaction from the Motor Fuel Tax. *See* § 31-36-13. Apex further claims that the Division improperly levied the Motor Fuel Tax on the transaction based on § 31-36-7, which permits the Division to impose the tax on "fuels purchased, sold, or used by [a] distributor within this state and the amount of fuels sold by [a] distributor without this state from fuels within this state * * *." Apex contends that its purchase of the gasoline from Glencore occurred wholly outside of

Rhode Island and, therefore, should not be subject to the Motor Fuel Tax established by § 31-36-7. Apex has a personal stake in the outcome of the merits of its claim that the Division improperly levied a tax on the Glencore-Apex transaction. *See Benson*, 273 A.3d at 129. Although Glencore paid the tax to the Division, it was reimbursed by Apex and, thus, Apex paid more than $4 million to Glencore as a result of the Division's imposition of the tax on the Glencore-Apex transaction.

Accordingly, we reject the Division's assertion that, simply because Apex was not the entity that paid the tax, it has not suffered an injury in fact. Apex has suffered substantial economic injury in fact in excess of $4 million. This economic injury is concrete and particularized; it is actual, not conjectural or hypothetical. *See Haviland*, 45 A.3d at 1256. We are therefore satisfied that Apex possesses the requisite personal stake in the outcome of this controversy and therefore has suffered an injury in fact.

The Division argues that to the extent Apex has suffered an injury, there was no causal connection between that injury and its decision to assess the tax. Specifically, the Division contends that "it [was] not the assessment of the motor fuel tax, or the statute imposing such assessment, that caused Apex's alleged injury, but rather the terms of a contract between Apex and Glencore, who actually paid the motor fuel tax." Although Apex entered into an agreement with Glencore to reimburse it for any tax levied on the transaction of its own volition, Apex's injury

is "trace[able] to the challenged action of the defendant * * *." *See Mruk*, 82 A.3d at 535 (quoting *Lujan*, 504 U.S. at 560). Thus, the action of the Division, namely, the Division's decision to deny Apex a certificate and then impose the tax were traceable to the Division and coalesced in Apex's injury. Apex's injury was not the result of any independent action of some third party not before the Court. *See id.* We therefore conclude that there is a causal connection between the Division's imposition of the Motor Fuel Tax on Apex's purchase of the subject gasoline and Apex's injury.

Because we have determined that Apex has suffered an injury in fact, we conclude that it is vested with standing to challenge the validity of the Division's imposition of the Motor Fuel Tax on its transaction with Glencore for the purchase of the 300,000 barrels of gasoline. *See Tanner*, 880 A.2d at 792.[12]

### *Res Judicata*

The Division next contends that the trial judge properly dismissed Apex's claims based upon the doctrine of *res judicata*. Specifically, the Division argues that, because Glencore entered into a settlement agreement regarding the penalty and interest assessed on top of the Motor Fuel Tax, Apex is precluded from challenging the Motor Fuel Tax in the first instance. Apex, however, claims that the trial judge

---

[12] Because we conclude that Apex has suffered an injury in fact, affording it standing to bring its claims, we need not address the issue of whether Apex has statutory standing.

erred in concluding that *res judicata* served to bar its claims because neither the elements of issue preclusion nor claim preclusion are satisfied in this case.

"The doctrine of res judicata relates to the preclusive effect of a final judgment in an action between the parties." *Plunkett v. State*, 869 A.2d 1185, 1187 (R.I. 2005). "This doctrine ensures that judicial resources are not wasted on multiple and possibly inconsistent resolutions of the same lawsuit." *Id.* (quoting *ElGabri v. Lekas*, 681 A.2d 271, 275 (R.I. 1996)). As this Court has previously explained, "the term 'res judicata' is commonly used to refer to two preclusion doctrines: (1) collateral estoppel or issue preclusion; and (2) res judicata or claim preclusion." *Id.* at 1188; *see also Foster-Glocester Regional School Committee v. Board of Review*, 854 A.2d 1008, 1014 n.2 (R.I. 2004) ("The doctrine of *res judicata* involves both the concepts of 'claim preclusion' and 'issue preclusion.'") (quoting 1 Restatement (Second) *Judgments 2d* ch. 1, Intro. at 1, 2 (1982)). This Court has opined that these doctrines should not "be mechanically applied, for [they are] capable of producing extraordinarily harsh and unfair results." *Casco*, 755 A.2d at 782 (quoting *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995)). "To avoid unfairness, courts have declined to apply [these doctrines] in situations in which [they] would lead to * * * inequitable result[s]." *Id.* "The burden is upon the party asserting *res judicata* * * *." *Huntley v. State*, 63 A.3d 526, 532 (R.I. 2013) (quoting 47 Am. Jur. 2d *Judgments* § 648 at 222 (2006)).

"Generally speaking, *res judicata* or claim preclusion 'relates to the effect of a final judgment between the parties to an action and those in privity with those parties.'" *Lennon v. Dacomed Corporation*, 901 A.2d 582, 590 (R.I. 2006) (quoting *E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Co. of Newark, New Jersey*, 635 A.2d 1181, 1186 (R.I. 1994)). "Claim preclusion prohibits the 'relitigation of all the issues that were tried or might have been tried in the original suit.'" *Id.* (emphasis omitted) (quoting *E.W. Audet & Sons*, 635 A.2d at 1186). "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar." *Plunkett*, 869 A.2d at 1188 (quoting *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 77 n.1 (1984)); *see also Torrado Architects v. Rhode Island Department of Human Services*, 102 A.3d 655, 659 (R.I. 2014) ("The principle underlying the rule of [*res judicata*] * * * is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so.") (quoting *Huntley*, 63 A.3d at 532).

Importantly, "[c]laim preclusion * * * does not require that the issue to be precluded has actually been litigated or necessarily decided. Rather, claim preclusion 'prohibits the relitigation of all issues that were tried or might have been tried in the original suit * * *.'" *Reynolds v. First NLC Financial Services, LLC*, 81

A.3d 1111, 1118 n.6 (R.I. 2014) (emphasis omitted) (quoting *Bossian v. Anderson*, 991 A.2d 1025, 1027 (R.I. 2010)). "Usually asserted in a subsequent action based upon the same claim or demand, the doctrine precludes the relitigation of all the issues that were tried or might have been tried in the original suit * * *." *Id.* at 1115 (quoting *E.W. Audet & Sons*, 635 A.2d at 1186). Claim preclusion will bar a second action "if the following three requirements are fulfilled: (1) the parties are the same or in privity with the parties of the previous proceeding; (2) an identity of issues in both proceedings; and (3) a valid final judgment on the merits has been entered in the previous proceeding." *Lennon*, 901 A.2d at 591.

The first element that we examine is whether the party against whom claim preclusion is asserted is identical to, or in privity with, a party involved in the settlement agreement. *See Lennon*, 901 A.2d at 591. Because Apex was not a party to the settlement agreement, in order for claim preclusion to apply, Apex must have been in privity with Glencore for purposes of the settlement agreement. *See Reynolds*, 81 A.3d at 1115 ("Determining whether there is 'identity of parties' requires resolving 'whether the parties to this second action are identical to or in privity with the parties involved in the [prior action].'") (quoting *E.W. Audet & Sons*, 635 A.2d at 1186). The Division contends that Apex is in privity with Glencore by way of the assignment. Apex, however, argues that, despite the assignment, it is not in privity with Glencore as it relates to the settlement agreement because, at the time

the agreement was reached, Apex and Glencore did not share a commonality of interest such that Glencore did not sufficiently represent Apex's interests.

"Under the concept of privity, a non-party may be bound by a prior judgment if that party substantially controlled or was represented by a party to the original action." *Commercial Union Insurance Company v. Pelchat*, 727 A.2d 676, 680 (R.I. 1999). "Under Rhode Island law, privity is defined by a commonality of interests." *Lennon*, 901 A.2d at 591. More specifically, "[p]arties are in privity when there is a commonality of interest between the two entities and when they sufficiently represent each other's interests." *Id.* (quoting *Duffy v. Milder*, 896 A.2d 27, 36 (R.I. 2006)). "Simply stated, a finding of separate and distinct entities does not define our privity analysis." *Id.*

We are unconvinced that Glencore's assignment of its rights to Apex establishes that the parties were in privity at the time the settlement was reached. In its reply brief, Apex asserts that Glencore granted it the assignment *after* Glencore entered into the settlement agreement with the Division. Taking the facts in the light most favorable to Apex, we are hard-pressed to conclude that Glencore and Apex shared a commonality of interests at the time of the settlement agreement such that Glencore adequately represented Apex's interests. *See Lennon*, 901 A.2d at 591.

Based upon their contract for the purchase and sale of the 300,000 barrels of gasoline, Apex was required to reimburse Glencore for any taxes imposed on

Glencore; the contract did not address penalties or interest that could be imposed in addition to the tax itself. Thus, Glencore had an incentive to challenge the penalties and interest as the contract did not require Apex to reimburse Glencore those fees. However, having been fully reimbursed for the tax itself, Glencore had no incentive to mount a challenge to the Division's authority to impose the tax. Undoubtedly, challenging the merits of the tax itself would have been an onerous task for Glencore; and an unnecessary and risky undertaking. Because Glencore was reimbursed by Apex for the amount of the tax, a challenge could jeopardize its hopes of relief from the interest and penalties. *Compare Shannahan v. Moreau*, 202 A.3d 217, 228 (R.I. 2019) (holding that privity existed between a city and a trust where the trust was the city's insurer and therefore "directly represent[ed] the interests of the city" and where pursuant to a consent order "the [t]rust ha[d] retained all defenses that the city would have had"), *with Casco*, 755 A.2d at 782 (explaining that "it would be unfair to apply [*res judicata*] '[i]f a defendant in the first action is sued for small or nominal damages, [because] he may have little incentive to defend vigorously'") (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979)). Because Glencore had no incentive to challenge the merits of the assessment of the Motor Fuel Tax itself, it did not represent Apex's interest during the settlement negotiations. We therefore conclude that Apex was not in privity with Glencore at the time the settlement agreement was reached. Thus, *res judicata* cannot apply to bar Apex's claims.

- 27 -

We also pause to note that the Division knew that Apex had an interest in the outcome of the settlement discussions, separate and apart from Glencore. In the Division's settlement offer letter, it noted that Glencore had "provided information" to the Division "that referred to other entities that are not Glencore" by way of a letter from Glencore "dated March 8, 2019." The Division declined to engage and responded that "[p]ursuant to Rhode Island state law, the Division is prohibited from discussing other taxpayers' information with unauthorized parties."

Because the determination that Apex was not in privity with Glencore defeats the Division's assertion of claim preclusion, we need not address the other elements.[13]

## Administrative Finality

The Division last argues that Apex's claims should be precluded by the doctrine of administrative finality because, it asserts, Glencore "resolved the matter

---

[13] To the extent the Division asserts that issue preclusion should apply to bar Apex's claims, we note that issue preclusion requires that the issue sought to be precluded "must actually have been litigated in the prior proceeding * * *." *Reynolds v. First NLC Financial Services, LLC*, 81 A.3d 1111, 1118 n.5 (R.I. 2014). The issue Apex raises in this case is whether the Division improperly levied the Motor Fuel Tax on its purchase of gasoline from Glencore, which, it asserts, occurred wholly outside of Rhode Island. This issue was not litigated and was certainly not decided in the settlement proceedings between Glencore and the Division. *See* Restatement (Second) *Judgments* § 27 cmt. e (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, [issue preclusion] does not apply with respect to any issue in a subsequent action."). We therefore conclude that Apex's claims are not barred by the doctrine of issue preclusion.

through the administrative process by way of a settlement of the assessment * * *."

Apex, however, contends that administrative finality should not be applied to bar its claims because the doctrine applies only where an initial request for tax relief was denied and because it is a different applicant from Glencore.

"Rhode Island * * * [has] promulgated a doctrine of administrative finality." *Johnston Ambulatory Surgical Associates, Ltd. v. Nolan*, 755 A.2d 799, 808 (R.I. 2000). "Under this doctrine, when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances during the time between the two applications." *Id.* "While the rule is sound, it is operative only if the relief sought in each case is substantially similar." *May-Day Realty Corporation v. Board of Appeals of City of Pawtucket*, 107 R.I. 235, 237, 267 A.2d 400, 402 (1970); *see also Johnston Ambulatory Surgical Associates*, 755 A.2d at 808 ("This rule applies as long as the outcome sought in each application is substantially similar * * * even if the two applications each rely on different legal theories."). Although related, the doctrines of administrative finality and *res judicata* are distinct:

> "They are related in that each one acts to partially or wholly preclude an administrative agency from revisiting an earlier decision. But, despite this similarity, there is an important difference between them. *Res adjudicata* functions as an *absolute* bar to a second cause of action on any matters that were actually raised or that could have been raised in the first proceeding. * * * Administrative finality, on the other hand, provides for a qualified and

- 29 -

limited preclusion, wherein a second application for substantially similar outcome from an administrative agency is barred unless the applicant can demonstrate a change in material circumstances between the two applications." *Johnston Ambulatory Surgical Associates*, 755 A.2d at 808-09.

In sum, the doctrine "prevents repetitive duplicative applications for the same relief, thereby conserving the resources of the administrative agency and of interested third parties that may intervene." *Id.* at 810. "The purpose of the doctrine is to promote consistency in administrative decision-making, such that if the circumstances underlying the original decision have not changed, the decision will not be revisited in a later application." *Id.*

We cannot conclude, in the circumstances before us, that the doctrine of administrative finality applies in this case. In *deBourgknecht v. Rossi*, 798 A.2d 934 (R.I. 2002), we held that "[t]he doctrine requires that the initial application for tax relief be denied." *deBourgknecht*, 798 A.2d at 938. Furthermore, Glencore's request for relief in the initial proceedings sought only penalty and interest abatement. Apex's request for relief, on the other hand, requested a refund of the tax itself based upon its assertion that the tax was improperly imposed. Thus, we conclude that the two requests were not the same or substantially similar. *Compare May-Day Realty Corporation*, 107 R.I. at 237, 267 A.2d at 402 (holding that a permit request to erect two ten-family apartment houses was not substantially similar to a permit request to construct a single apartment building containing one hundred units such that the

doctrine of administrative finality did not apply), *with Costa v. Gagnon*, 455 A.2d 310, 313 (R.I. 1983) (holding that two separate petitions seeking approval of auto-body-shop use were substantially similar despite the fact that each petition asserted a different legal theory and therefore the second petition was barred by the doctrine of administrative finality).

## Conclusion

For the reasons set forth herein, the order of the District Court is quashed. The papers in this case may be returned to the District Court with our decision endorsed thereon.

**Justice Long, dissenting.** In petitioning this Court for the issuance of a common law writ of certiorari in these consolidated cases, Apex made an unequivocal allegation: The Division "unlawfully imposed a $4 million plus Rhode Island Motor Fuel Tax *on Apex*." (Emphasis added.) Apex further alleged that both the Tax Administrator and the district court have denied it the ability to obtain a remedy because "both committed error by granting motions to dismiss on threshold issues." After review of the operative pleadings and consideration of the parties' written and oral arguments, I disagree that Apex has pled facts sufficient to establish that Apex, individually or as assignee of Glencore, is a proper party to challenge the

Division's imposition of the motor fuel tax on the March 15, 2018 transaction between Apex and Glencore. Therefore, I respectfully dissent.

The facts as pled in the operative pleadings reveal that Apex, an energy commodities trader, engaged in a sophisticated chain transaction concerning the purchase and sale of hundreds of thousands of barrels of gasoline in international waters. The dispute at issue in this appeal concerns the March 15, 2018 transaction between Apex and Glencore: the Division taxed *Glencore* months after the transaction because Apex was not a licensed distributor. However, pursuant to an agreement between Apex and Glencore, Apex was responsible for any tax assessed on the transaction; Apex reimbursed Glencore accordingly and received "a full assignment of Glencore's rights to obtain a refund and challenge the Motor Fuel Tax and Oil Spill Fee."[1]

At every stage of this litigation, Apex has asserted its "claim on its own and as an assignee of Glencore." For example, in the initial denial-of-claim letter issued by the Division on June 6, 2019, the revenue agent writes, "[p]lease be aware, we did not receive supporting documents regarding the assignment rights from Glencore * * *." When Apex filed its first complaint in district court, it did so individually and as assignee of Glencore. Similarly, when Apex administratively appealed the

---

[1] As the majority indicates in footnote 6, Glencore filed a breach-of-contract suit against Apex in 2019 in the United States District Court for the Southern District of New York.

denial of its claim for refund, it did so individually and under the assignment from Glencore. Consequently, after the Division filed a motion to dismiss the administrative appeal, the decision of the hearing officer evaluated the standing of Apex to file a claim for refund both on its own and pursuant to the assignment from Glencore.

With regard to the standing of Apex to file a claim for refund on its own, the hearing officer concluded that Apex did not have statutory standing because Apex did not pay the tax in question to the Division. The hearing officer also determined that Apex did not have standing because "[a]ny injury that [Apex] suffered is not because the Division assessed a tax on it." In reaching this conclusion, the hearing officer noted that standing required that the injury in fact have a causal connection to the actions of defendant and "[h]ere, the Division's challenged action – the tax assessment to [Glencore] – did not cause a particular and concrete injury to [Apex] by the Division. Rather, [Apex] is trying to recoup its contractual payment to [Glencore] from the Division."

Concerning the standing of Apex to file a claim for refund pursuant to the assignment, the hearing officer noted that Glencore had previously "appealed the assessment and challenged the interest and penalties connected to the tax assessment and settled with the Division." Although Glencore thereafter assigned its right to challenge the assessment to Apex, because Glencore had already settled with the

Division, any further challenge to the assessment would be barred by the doctrines of *res judicata* and administrative finality. Consequently, the hearing officer reasoned, the "assignment to challenge the tax assessment does not give [Apex] standing to challenge something that cannot be challenged."

Having determined that Apex did not have standing to file a claim for refund individually or under the assignment from Glencore, the hearing officer nonetheless analyzed whether the doctrine of *res judicata* also precluded Apex from pursuing a claim for refund under the assignment from Glencore. The hearing officer considered that, under the assignment, Apex "is the same party as [Glencore]" and "identity of issues is the same since [Apex] is trying to challenge the motor fuel tax assessment that the Division issued to [Glencore]." Furthermore, the hearing officer concluded, because Glencore settled the tax assessment dispute with the Division, the settlement operated as a final judgment and precluded Apex from relitigating the claim.

Finally, the hearing officer also analyzed the doctrine of administrative finality, notwithstanding the conclusion that Apex lacked standing to pursue a refund of the claim. The hearing officer concluded that,

> "[a]s much as [Apex] wants to characterize this matter as its challenge to its tax assessment, [Apex] – as detailed in its facts – contractually paid the amount of tax to [Glencore, which] challenged its tax assessment and resolved its appeal. An administrative decision by way of settlement resolved the challenge to the tax assessment.

> There is no change in material circumstances as [Apex] is challenging the tax assessment to [Glencore]. Thus, like claim preclusion, administrative finality precludes a challenge here because there has been a final resolution via administrative action on the challenge to the assessment."

After the Tax Administrator adopted the hearing officer's decision and dismissed the administrative appeal, Apex, individually and as assignee of Glencore, filed a second complaint in district court seeking to overturn the final decision of the Division. The district court consolidated the two matters pending in that court before granting the motion to dismiss both complaints.

In dismissing the consolidated cases, the trial judge noted that the parties presented three issues: (1) whether Apex had standing; (2) whether Apex's claims were barred by *res judicata*; and (3) whether Apex's refund claim was barred by the statute of limitations. Ultimately the trial judge granted the Division's motions to dismiss based on *res judicata*. The trial judge clarified that he was holding that Apex, suing in its own right, was barred by *res judicata*; the trial judge never reached the issue of standing.

This Court issued the writs of certiorari to consider whether the trial judge committed an error of law. Although the trial judge did not address whether Apex has standing, either individually or under the assignment from Glencore, I believe that the operative pleadings reveal that Apex does not have standing in either case. Specifically, Apex cannot bring its claim in its own right under G.L. 1956 § 31-36-

13, nor can it demonstrate that its injury is causally connected to the Division's actions.

This Court has stated that, when determining whether standing exists, we "must focus on the party who is advancing the claim rather than on the issue the party seeks to have adjudicated." *Dauray v. Mee*, 109 A.3d 832, 840 (R.I. 2015) (quoting *N & M Properties, LLC v. Town of West Warwick*, 964 A.2d 1141, 1145 (R.I. 2009)). This case involves multiple energy commodities traders, their sophisticated chain transaction, and the agreements that they entered into in pursuit of their commodities trades; thus I believe it is necessary to bear in mind whether Apex is advancing its claims individually or as an assignee of Glencore's rights. *See Watson v. Fox*, 44 A.3d 130, 135 (R.I. 2012) ("[A] court must determine if the plaintiff whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable or, indeed, whether or not it should be litigated.") (quoting *McKenna v. Williams*, 874 A.2d 217, 226 (R.I. 2005)). After close examination of the operative pleadings and the extensive documents incorporated therein, I am persuaded that the hearing officer correctly evaluated Apex's standing, both individually and as an assignee of Glencore's rights.[2] I further believe that, because Apex lacks standing, both individually and

---

[2] In fact, despite the attention to these distinct theories at every stage of the litigation, during oral argument, Apex seemed to concede that, once Glencore settled its

pursuant to the assignment, to pursue its claim for a refund from the Division of monies paid to Glencore under its contractual obligations, there is no need to address the doctrines of *res judicata* and administrative finality.

To have standing, the plaintiff must either be "the beneficiary of express statutory authority" or have suffered an injury in fact. *Tanner v. Town Council of Town of East Greenwich*, 880 A.2d 784, 792 (R.I. 2005). "In statutory standing cases, such as this, the analysis consists of a straight statutory construction of the relevant statute to determine upon whom the Legislature conferred standing and whether the claimant in question falls in that category." *Id.* at 792 n.6. This Court interprets the statute, giving the unambiguous language its plain and ordinary meaning and "adopting a construction of a statute" that effectuates the Legislature's intended purpose. *Id.* at 792-93. Apex sought a reimbursement under § 31-36-13. Section 31-36-13 provides that:

> "Any person who shall purchase fuels upon which the tax provided in this chapter shall have been paid and shall sell the fuels outside this state or to the United States government, may be reimbursed the amount of the tax in the manner and subject to the conditions provided in this chapter. All claims for reimbursement shall be made under oath * * * and shall contain any information and proof that the tax administrator may require, *that the claimant has paid the tax * * *.*" (Emphasis added.)

---

administrative appeal of the tax assessment, Glencore no longer had a viable claim that it could assign to Apex.

Under the clear and unambiguous language of the statute, Apex does not have statutory standing because it did not have a statutory obligation to pay the tax at issue in this case. Moreover, aside from the petitions for writ of certiorari filed in this matter, nowhere does Apex allege that it actually paid the tax, rather than merely reimbursed Glencore, the actual taxpayer, pursuant to the parties' agreement, for taxes and fees that Glencore paid to the Division.

To otherwise have standing, a plaintiff must satisfy three requirements: (1) "[t]he plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not conjectural or hypothetical." *Mruk v. Mortgage Electronic Registration Systems, Inc.*, 82 A.3d 527, 535 (R.I. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Additionally, a plaintiff must demonstrate (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly * * * trace[able] to the challenged action of the defendant, and not * * * th[e] result [of] the independent action of some third party not before the court." *Id.* (quoting *Lujan*, 504 U.S. at 560). Finally, a plaintiff must demonstrate that it is (3) "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 561).

I concede that Apex has pled sufficient facts to satisfy the first requirement: Apex has suffered a concrete injury in fact because the Division imposed a tax on

- 38 -

Glencore related to the March 15, 2018 transaction, which ultimately resulted in Apex paying more than $4 million to Glencore. *See Mruk*, 82 A.3d at 535; *Watson*, 44 A.3d at 135 ("To satisfy the standing requirement, a plaintiff must allege 'that the challenged action has caused him injury in fact, economic or otherwise.'") (quoting *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 22, 317 A.2d 124, 128 (1974)). However, the standing analysis compels rigorous evaluation of all three requirements. After evaluating causal connection and redressability, I do not believe that Apex has demonstrated, through its extensive pleadings, that it can meet those two requirements. Thus, although the $4 million that Apex paid to Glencore is fairly traceable to the Division's tax assessment on the March 15, 2018 transaction, that is not the end of the analysis. I believe that the economic injury suffered by Apex, though fairly traceable to the Division's assessment on Glencore, has a tenuous connection to the Division's action and ultimately is the result of independent actions by one or more third parties not before the court.

The causation element "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (citing *Lujan*, 504 U.S. at 560). I do not believe that Apex has demonstrated a sufficiently direct link between the assessment levied on the March 15, 2018 transaction and Apex's economic injury. Although the Division denied a distributor license to Apex and assessed the tax

against Glencore, these were not the only actions that led to Apex's injury. The chain transaction involved multiple entities: prior to the March 15, 2018 transaction, BP purchased the 300,000 barrels of gasoline from Apex and subsequently resold the gasoline to ExxonMobil, which directed delivery to occur in East Providence and resulted in taxation by the Division. Additionally, as the majority also notes, Glencore voluntarily paid the tax to the Division and challenged only the interest and penalties. Thus, Apex's economic injury is ultimately the result of the independent action of a third party, Glencore.[3] *See Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc.*, 958 F.3d 38, 48 (1st Cir. 2020) (concluding that the plaintiff Dantzler lacked standing because it could not prove that the defendant's actions were the direct cause of the injury because the injury "depended on the actions of the ocean freight carriers, the entities that were required to pay the [enhanced security fees (ESFs)] to [Puerto Rico Ports Authority (PRPA)] [and] Dantzler did not directly pay the ESFs to PRPA, nor did PRPA assess the ESFs on Dantzler; rather, Dantzler alleges, without elaboration, that the ocean freight carriers collected ESFs from their customers -- i.e., the shipper entities like Dantzler"). The Division's failure to issue a distributor license to Apex is of minimal relevance to the causation analysis: it was Glencore's decision to pay the assessment and

---

[3] It is worth noting, once again, that after Glencore settled its administrative appeal of the tax assessment and assigned its remaining interest, it no longer had a viable claim to assign to Apex.

- 40 -

thereafter to settle its administrative appeal that broke the causal chain between the Division's conduct and the economic injury identified by Apex. It is also noteworthy that Apex, a sophisticated commodities trader, negotiated an agreement with Glencore that, for whatever reason, made Apex responsible for any tax assessed, and further that Apex reimbursed Glencore pursuant to that agreement.

My view of the causal nexus required to link a taxpayer to the taxing authority is also informed by persuasive decisions of various federal courts in comparable cases. For example, in *Ammex, Inc. v. United States*, 52 Fed. Cl. 303 (2002), a decision that was thereafter affirmed by the Federal Circuit, the Federal Claims Court considered whether the defendant had standing to seek a refund for gasoline and diesel fuel purchases under relevant federal law. *Ammex, Inc.*, 52 Fed. Cl. at 308, *aff'd* 384 F.3d 1368 (Fed. Cir. 2004). That court noted that "[i]t has been well established that in order to maintain an action for the refund of federal taxes under the Internal Revenue Code, the plaintiff *must* be a taxpayer who has overpaid its own taxes." *Id*. at 309. That court has also strictly interpreted "taxpayer" as being limited to an "entity who pays, overpays, or is subject to pay its own taxes." *Id*.; *Economy Plumbing & Heating Co. Inc. v. United States*, 470 F.2d 585, 589 (Ct. Cl. 1972) ("[P]ersons *who are not taxpayers* are not within the system and can obtain no benefit by following the procedures prescribed for taxpayers, such as the filing of claims for refunds."); *Collins v. United States*, 532 F.2d 1344, 1348 (Ct. Cl. 1976)

- 41 -

("In cases involving the payment of tax liabilities by a third party, it is fundamental that the plaintiff cannot recover if the payment in issue was voluntary and the plaintiff bears the burden of proving some element which would remove him from the category of volunteer.").

Finally, with respect to the redressability requirement, I am unconvinced that a favorable decision in this case would result in Apex achieving the relief it seeks. Specifically, Apex asks the court to compel the Division to reimburse Apex the more than $4 million that Apex *paid to Glencore* for the tax. This is because the Division did not assess taxes against Apex, but instead assessed taxes against an independent third party, Glencore.

I acknowledge that Apex, a sophisticated commodities trader, alleges serious constitutional violations regarding the Division's taxation of the purchase and sale of energy commodities in international waters. However, the mere allegation of a constitutional violation has never been the key factor that drives a conclusion that a plaintiff's claims are justiciable; this Court's standing doctrine requires that we have "a proper party [requesting] an adjudication of a particular issue * * *." *Key v. Brown University*, 163 A.3d 1162, 1169 (R.I. 2017) (quoting *Watson*, 44 A.3d at 135). My examination of the certified record submitted to this Court pursuant to the writs issued in these consolidated cases compels me to conclude that Apex cannot demonstrate that it is the proper party to request adjudication of this important issue.

- 42 -

Accordingly, I would dismiss the petitions and remand the papers to the district court with instructions to enter final judgment in favor of the Division.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Apex Oil Company, Inc., individually and as Assignee of Glencore, Ltd. v. State of Rhode Island, acting by and through Division of Taxation. |
| **Case Number** | No. 2021-116-M.P.  (A.A. 20-72)<br>No. 2021-117-M.P.  (6CA 19-7653) |
| **Date Opinion Filed** | July 24, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | 6th Division District Court |
| **Judicial Officer from Lower Court** | Associate Judge Christopher Smith |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Ryan M. Gainor, Esq. |
| | For Defendant:<br><br>Bethany M. Whitmarsh, Esq. |